IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TOPLINE SOLUTIONS, INC.,
*Plaintiff/Counter-Defendant*,

v.

SANDLER SYSTEMS, INC.,
*Defendant/Counter-Plaintiff.*

Civil Action No. ELH-09-3102

**MEMORANDUM OPINION**

Almost seven and a half years ago, on November 19, 2009, Topline Solutions, Inc.

("Topline, Inc.") filed suit against Sandler Systems, Inc. ("SSI") alleging, *inter alia*, that SSI

breached two agreements between the parties. ECF 1. In particular, Topline, Inc. asserted that

SSI breached a "Co-Development Agreement" (*see* ECF 1-1, "CDA") and an "Agreement and

Mutual Release" ("AMR"), also known as the "High Tech Boot Camp Agreement"

("HTBCA").[1] *See* ECF 1-2.

On August 20, 2016, nearly seven years after suit was filed, SSI moved for leave to file a

counterclaim against Topline, Inc.; a third-party complaint against Steven Kramer, the founder

and president of Topline, Inc.; and a second amended answer. ECF 253. At a hearing held on

November 30, 2016 (ECF 292), Judge Motz orally granted that motion, as well as SSI's second

motion for partial summary judgment (ECF 248). Judge Motz's rulings are embodied in an

Order of December 1, 2016. ECF 297. Consistent with Judge Motz's ruling, SSI's submissions

were docketed collectively on December 1, 2016. ECF 298. A few days later, on December 12,

_____

[1] The case was initially assigned to Judge Peter J. Messitte. A few months later, Judge
Messitte transferred the case to the Northern Division (*see* ECF 22), where it was assigned to
Judge Benson E. Legg. ECF 23. Due to the retirement of Judge Legg, the case was reassigned
to Judge William D. Quarles, Jr. in October 2012. ECF 136; *see* docket. It was reassigned to me
on January 22, 2016, due to the retirement of Judge Quarles. *See Docket*. Judge J. Frederick
Motz graciously agreed to resolve the pending motions, because of his availability.

2016, SSI filed an "Amended Counterclaim and Third-Party Complaint." ECF 312 (the "Counterclaim").

In its Counterclaim, SSI asserts, *inter alia*, claims against Topline, Inc. for breach of contract (counts I and II); copyright infringement (Count III); and fraud/intentional misrepresentation (Count IV). Counts I, III, and IV are also lodged against Kraner as third-party defendant. *See id.* I shall refer to Topline, Inc. and Kraner collectively as "Topline." The claims are rooted in Topline's registration of a copyright in January 2011 of a work that SSI claims contains its intellectual property. ECF 312. I shall discuss the specifics of SSI's claims, *infra*, in the context of the analysis. In its Second Amended Answer (ECF 298), SSI asserts several additional affirmative defenses, consistent with its Counterclaim. *See* ECF 298.

Topline has moved to dismiss the Counterclaim (ECF 320), supported by a memorandum (ECF 320-1) (collectively, "Motion to Dismiss") and an exhibit. ECF 320-2. Also pending is Topline, Inc.'s motion to strike SSI's newly asserted affirmative defenses in the Second Amended Answer. ECF 321 ("Motion to Strike"). SSI filed a consolidated opposition to both motions (ECF 324, "Opposition")[2] and Topline submitted a consolidated reply. ECF 331 ("Reply").

The motions are fully briefed and no hearing is necessary to resolve them. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion to Dismiss in part and deny it in part, and I shall deny the Motion to Strike.

---

[2] In its Opposition, SSI incorporated by reference arguments made in previous filings. *See* ECF 324 at 11 (incorporating ECF 264 at 12-17; ECF 308 at 17-20, 59-62). Incorporating lengthy arguments by reference is, at best, inconvenient for the Court, particularly when the earlier submissions were presented to a different judge. At worst, it is an end around the page limitations set forth in Local Rule 105.3.

# I.    Factual Background[3]

SSI is a Maryland corporation with its principal place of business in Maryland. ECF 312, ¶ 2. Topline, Inc. is a Virginia corporation with its principal place of business in Virginia. *Id.* ¶ 3. Kraner is the founder, president, and sole stockholder of Topline, Inc. and is a citizen of Virginia. *Id.* ¶¶ 4, 17.

Beginning in the 1970s, David Sandler "developed and modified the Sandler Selling System, and the concepts contained therein." *Id.* ¶ 12. The Sandler Selling System is a "distinctive style of training persons in the fields of sales and sales management, which includes . . . management consulting, goal setting and achievement, self-awareness, motivation, personal development, relationship management and leadership development . . . ." ECF 312, ¶ 12. The Sandler Selling System also includes the methods of teaching these subjects through "seminars and workshops." *Id.*

SSI asserts: "Prior to 2007, SSI and its franchisees used the trading name and mark 'Sandler Sales Institute.'" *Id.* ¶ 14. But, SSI claims that SSI and its franchisees "began using the trading name and mark 'SALES TRAINING' in place of the name and mark 'Sandler Sales Institute.'" *Id.*; *see id.* ¶ 13.[4]

## A.  The Franchise Agreements

On or about December 3, 1993, Kraner and SSI entered into a franchise agreement by which "Kraner was granted the right to own and operate a Sandler Sales Institute franchise in

---

[3] I note that in ECF 105 and ECF 106, Judge Legg provided factual background for his rulings. Similarly, in ECF 194 and ECF 204, Judge Quarles provided factual summaries. I adopt those summaries and amplify the facts here, to the extent necessary to resolve the Motion to Dismiss and the Motion to Strike.

[4] It appears that SSI's reference to the mark "SALES TRAINING" is an error. Presumably, SSI meant to say "SANDLER TRAINING." *See* ECF 312, ¶ 13 ("The distinguishing characteristics of the Sandler Selling System include, but are not limited to, the name and mark Sandler Sales Institute or SANDLER TRAINING . . . .").

Northern Virginia." *Id.* ¶ 16; *see* ECF 312-3 ("1993 Franchise Agreement"). In July 2004, Kraner assigned his rights and duties under the 1993 Franchise Agreement to Topline, Inc. ECF 312, ¶ 18.

Topline, Inc. renewed the 1993 Franchise Agreement on November 8, 2005. *Id.* ¶ 19; *see* ECF 312-4 ("2005 Franchise Agreement"). Kraner was a guarantor as to certain provisions. ECF 312, ¶ 20; *see* ECF 312-4 at 29. As discussed, *infra*, on November 8, 2005, Topline, Inc., Kraner, SSI, and others also entered into the HTBCA. ECF 312, ¶ 35.

During the pendency of this litigation, Topline, Inc. and SSI twice renewed the franchise agreement. In particular, the franchise agreement was renewed in 2010 and again in 2015. ECF 312, ¶¶ 22, 23; *see* ECF 312-5 ("2010 Franchise Agreement"); ECF 312-6 ("2015 Franchise Agreement"). Although there are some variations in the text of the 2005, 2010, and 2015 franchise agreements, the differences are not material to the motions. I shall refer to the 2005, 2010, and 2015 franchise agreements collectively as the "Franchise Agreements."

Unlike in 2005, Kraner was not a guarantor of either the 2010 or the 2015 franchise agreement. *See* ECF 312-5 at 36; ECF 312-6 at 37. In connection with the 2010 Franchise Agreement, the parties executed a Confidential Disclosure Agreement (ECF 312-5), which recognized that Topline, Inc. possessed certain "Confidential Information" available for SSI to review. *Id.* The 2015 Franchise Agreement includes a five-year term that expires on June 30, 2020. ECF 312-6 at 57.

The term "Proprietary Assets" is defined in the Franchise Agreements. For example, the 2010 Franchise Agreement provides, ECF 312-5 at 3:

> [T]he distinguishing characteristics of the Sandler System include, but are not limited to, the name and mark SANDLER TRAINING® together with such other trade names, service marks, trademarks, copyrights, titles, symbols, logotypes, trade dresses, emblems, slogans, insignias, terms, designations, designs, diagrams,

anecdotes, artworks, worksheets, techniques, rules, ideas, philosophies, illustrations, course materials, advertising and promotional materials, and other audio, video and written materials as SSI has developed and designated for use in connection with the Sandler System, and as SSI may hereafter acquire, develop or designate for use in connection with the Sandler System ("Proprietary Assets") . . . .

*See also* ECF 312-4 (2005 Franchise Agreement), at 4; ECF 312-6 (2015 Franchise Agreement), at 4.

Paragraph 5.1 of the Franchise Agreements is titled "LIMITATIONS OF FRANCHISE." ECF 312-4 at 10; ECF 312-5 at 11; ECF 312-6 at 12. The provisions in the Franchise Agreements are largely identical, with variations that are not material to the disposition of the motions. Paragraph 5.1 of the 2010 Franchise Agreement states, ECF 312-5 at 11-12:

5.1 (a) Franchisee acknowledges that SSI is the exclusive owner of the Proprietary Assets and of the standards, specifications, operating procedures and other elements of the Sandler System. Franchisee further acknowledges that any modifications to the Sandler System or any substitutions or additions to the Proprietary Assets suggested or developed by Franchisee and approved by SSI shall be owned exclusively by SSI and may be incorporated by SSI into the Proprietary Assets.

(b) Franchisee shall use the Sandler System and the Proprietary Assets strictly in accordance with the terms of this Agreement and all policies set forth from time to time in the Operations Manual. Any unauthorized use of the Sandler System and/or the Proprietary Assets is and shall be deemed to be an infringement of SSI's rights. Franchisee agrees that producing, or permitting to be produced, its own written materials or audio or audiovisual recordings, webinars, podcasts, recorded conference calls, tapes or CDs or other creation in any medium (collectively, "Recordings") for sale, publication or distribution, with or without charging a fee, containing any of the Proprietary Assets or Sandler System is not authorized and shall be deemed an infringement of SSI's rights unless the Franchisee obtains SSI's prior written approval . . . .

\*       \*       \*

(d) Franchisee shall at no time take any action whatsoever to contest the validity, ownership, distinctiveness or enforceability of the Proprietary Assets and the good will associated therewith. Franchisee agrees that any use by Franchisee of all or any part of the Sandler System or the Proprietary Assets contrary to any provision of this Agreement, or any use by Franchisee of any

confusingly similar method, format, procedure, technique, system, name, trade dress, mark, symbol, emblem, slogan, insignia, term, designation, design, diagram, promotional material or course material, during or after the term of this Agreement, shall cause irreparable injury to SSI, shall constitute a material breach of this Agreement, and shall entitle SSI to seek temporary, preliminary or permanent injunctive relief from a court or agency of competent jurisdiction, and to recover court costs, reasonable expenses of litigation, reasonable attorneys' fees, and any other appropriate remedies.

*See also* ECF 312-4 at 10-11; ECF 312-6 at 12-13.

Section 12 of the Franchise Agreements pertains to covenants concerning non-competition, protection of Proprietary Assets, and confidentiality. Paragraph 12.2 in the 2010 Franchise Agreement states, ECF 312-5 at 29:

12. 2 Franchisee, and persons controlling, controlled by or under common control with Franchisee, shall not, directly or indirectly, without SSI's prior written consent, during the term of the Franchise and at any time thereafter, use any of the Proprietary Assets . . . for any purpose not authorized in writing by SSI; use any confusingly similar method, format, procedure, technique, system, name, trade dress, mark, symbol, emblem, slogan, insignia, term, designation, design, diagram, promotional material or course material; or cause or permit any facility or program to look like, copy or imitate any facility or program operated or licensed by SSI.[5]

## B. The High Tech Boot Camp Agreement

Prior to the renewal of the franchise agreement in 2005, SSI learned that Topline, Inc. and another franchisee, Ram Das, Inc. ("Ram Das" or "RDI"), "were printing material, commonly referred to as the High Tech Bootcamp Material ("HTBC Material"), derived from and containing SSI's Proprietary Assets without purchasing the materials from SSI." ECF 312, ¶ 33. According to SSI, this constituted a breach of the 1993 Franchise Agreement. *Id.* ¶ 34.

_____

[5] The language of ¶ 12.2 in the various Franchise Agreements is identical, with minor exceptions. In the 2005 Franchise Agreement, ¶ 12.2 prohibited the franchisee from using Proprietary Assets "for any unauthorized purpose." *See* ECF 312-4 at 24. In the 2010 Franchise Agreement, ¶ 12.2 provided that a franchisee may not use "Proprietary Assets for any purpose not authorized in writing by SSI." *See* ECF 312-5 at 29. And, in the 2015 Franchise Agreement, ¶ 12.2 states that a franchisee may not use "Proprietary Assets or Optional Programs for any purpose not authorized in writing by SSI." *See* ECF 312-6 at 31.

In a Declaration executed by Kraner in November 2011 (ECF 89-38), submitted in support of a motion for partial summary judgment filed by Topline, Inc. (ECF 89), Kraner asserted that, during a SSI training session in 1991, Kraner notified Sandler of flaws in SSI's training guidance. ECF 89-38, ¶¶ 6-7.[6] In particular, Kraner informed Sandler that he was uncomfortable with a component of the Sandler Sales System called the "Pretense Call" because that component was, in his view, deceptive, and "that aspect of the program [was] lacking integrity." *Id.* ¶ 7. According to Kraner, Sandler invited Kraner to "come up with a better way." *Id.* Kraner states that in 1992, after he began working full time as a SSI franchisee, Kraner and Guru Ganesha Singh Khalsa, the owner of Ram Das, developed a new method, which Kraner refers to as "The Honest Cold Call." *Id.* ¶ 9.

In the Declaration, Kraner averred that in 1993 he and Khalsa decided to focus their sales and marketing efforts on "High-Tech" customers – *i.e.*, customers in the software and technology industries. *Id.* ¶¶ 11-12. According to Kraner, he and Khalsa agreed that SSI's "base material was developed for what Sandler called 'living room sales,'" but that the materials were not suited for larger, more complex corporate settings. *Id.* ¶ 13. Therefore, Kraner and Khalsa made changes to the base SSI materials, including introducing customization; adding the "Honest Cold Call"; expanding buying motives; modifying "the pain/gain funnel"; and writing and sending recaps of sales calls via e-mail with clients. *Id.*

Kraner claimed that he and Khalsa presented the new "High-Tech Selling System" to Sandler, who "encouraged [their] efforts to focus on . . . the high technology market and to develop and use the High-Tech Selling System." *Id.* ¶ 14. And, Kraner asserted that Sandler agreed to allow him and Khalsa to create High-Tech Selling System materials for use during

---

[6] The relationship between Kraner and SSI apparently preceded the first franchise agreement, executed in December 1993. *See* ECF 312-3 at 28.

training programs. *Id.* Thereafter, Kraner and Khalsa created "customizable workbooks, a set of PowerPoint slides and audio recordings." *Id.* After its initial development in 1993, Kraner and Khalsa continued to "develop and refine" the High-Tech Selling System. *Id.* ¶ 15.

On November 8, 2005, SSI, Topline, Inc., Kraner, Ram Das, and Khalsa entered into the HTBCA to "confirm in writing [the parties'] agreement with respect to the production and ownership" of SSI's intellectual property and "to provide for the payment of the production fee by Ram Das and Topline to SSI . . . ." ECF 312, ¶¶ 35, 38; ECF 312-7 (HTBCA) at 3, ¶ I. In the HTCBA, Topline, Inc. is defined as "Topline" and Steven Kraner is defined as "Kraner." ECF 312-7 at 2. Among other things, the HTBCA grants Topline and Ram Das exclusive rights to use, distribute, and sell certain manuals, audio recordings, and presentation materials that teach what is known as the "high-tech" method of sales training. ECF 312-7; §§ 2, 2.3, and ¶ J.

Two terms defined in the HTBCA are at the core of the disputes between Topline and Sandler.

The first term, "Sandler Proprietary Assets," is defined in the following "Explanatory Statement" of the HTBCA, ECF 312-7, ¶ B:

> B. The distinguishing characteristics of the Sandler System include, but are not limited to, the name and mark SANDLER SALES INSTITUTE®, together with such other trade names, service marks, trademarks, copyrights, titles, symbols, trade dresses, emblems, slogans terms, designations, designs, diagrams, anecdotes, artworks, worksheets, techniques, and other audio, video and written material as SSI has developed, produced and designated for use in connection with the Sandler System, and as SSI may hereafter acquire, develop, produce or designate for use in connection with the Sandler System ("Sandler Proprietary Assets").

The second term, "Subject Proprietary Assets" (also referred to as the "HTBC Materials"), is defined in ¶ G of the HTBCA. It provides:

> G. Ram Das, Khalsa, Topline and Kraner have jointly developed a manual (the "Manual"), which is based on and incorporates material derived from the

Sandler Proprietary Assets and which is designed for use in delivering training in the Sandler Selling System to their clients. Ram Das, Khalsa, Topline and Kraner will also develop (a) audio recordings of Khalsa delivering training on the Sandler Selling System, which support the Manual (the "Audio"), and (b) presentation materials in Microsoft PowerPoint® format derived from the Manual and designed for use with the Manual in delivering training in the Sandler Selling System (the "PowerPoint Materials"). The parties acknowledge and agree that the current version of the Manual is attached hereto as Exhibit A [*see* ECF 261-11] . . . . For convenience of reference, the Manual, the Audio and the PowerPoint Materials, together with such modifications or updates as shall be made in accordance with Section 3.1. below, are collectively referred to as the "Subject Proprietary Assets."

Section Four of the HTBCA is titled "Ownership of Subject Proprietary Assets." *See* ECF 312-7 at 6. It provides, *id.*:

4. . . . Ram Das, Khalsa, Topline and Kraner each acknowledge and agree that they developed the Subject Proprietary Assets as a derivative work of certain Sandler Proprietary Assets. Ram Das, Khalsa, Topline and Kraner acknowledge and agree that SSI is the sole and exclusive owner of the Sandler Proprietary Assets and any derivative works of such Sandler Proprietary Assets, including the Subject Proprietary Assets.

> 4.1 Ram Das, Khalsa, Topline and Kraner further acknowledge and agree that:
>
>> 4.1.1 The Sandler Proprietary Assets contained in the Subject Proprietary Assets, including any future updates or modifications thereto, are the sole and exclusive property of SSI.
>>
>> 4.1.2 No copyright registration has or will be obtained by Ram Das, Khalsa, Topline or Kraner in the Subject Proprietary Assets with the United States Copyright Office.
>
> 4.2 Ram Das, Khalsa, Topline and Kraner understand and agree that they are hereby forever relinquishing any right to independently produce or re-produce the Subject Proprietary Assets, or any variation thereon, including the Prior Workbook . . . .

Section Five of the HTBCA, titled "Production Fee," provides that Ram Das, Khalsa, Topline, and Kraner would purchase, *inter alia*, the Manual and the Audio exclusively from SSI. *See* ECF 312-7 at 6-7. And, ¶ 9.3, in the section, titled "Cross Default Provisions," is notable.

*Id.* at 11.  It provides, *id.*: "A material default by Ram Das or Topline under this Agreement shall be deemed a default under the Ram Das or Topline's License Agreement, as may be respectively applicable."

Concurrent with the execution of the HTBCA, Topline and SSI signed an Estoppel Certificate.  It bars SSI from pursuing any causes of action against Topline or Ram Das for any prior breaches of the respective franchise agreements by way of improper printing or use of the HTBC Materials.  *Id.* ¶ 37.

## C.  The Co-Development Agreement

Kraner and Khalsa, through Topline, Inc. and RDI, respectively, "jointly invented a unique, proprietary program for teaching negotiation and related skills called 'Negotiating with the Savvy Buyer' (the 'TSI/RDI Negotiation Program')."  ECF 1, ¶ 21.  On or about March 7, 2006, Topline, Inc.; RDI; and SSI entered into the CDA.  *Id.* ¶ 22; *see* ECF 1-1 (CDA).  The CDA provides that the parties "desire to modify the TSI/RDI Negotiation Program by adapting it to the methodology of SSI and adding SSI proprietary concepts in order to jointly develop and produce a new program . . . to be marketed and sold to SSI's Franchisees, International Partners and International Licensees . . . ."  ECF 1-1 at 3, ¶ H.

Under the CDA, SSI agreed to pay both Topline and RDI a twenty percent royalty of "SSI's net receipts, if any, from the sale of the SSI Negotiation Program to the Sandler Franchise Network, including initial and subsequently modified materials."  ECF 1-1 at 14, ¶ 7(a); *see also* ECF 1, ¶ 27.  "Net receipts" was defined to include "all of SSI's revenues of every kind and character actually collected from the sale of the [SSI Negotiation Program], less all applicable sales and use taxes, gross receipts taxes and similar taxes received by SSI, and by any applicable bona fide refunds, rebates or discounts paid by SSI."  ECF 1-1 at 14.  Paragraph 7(a) also

provided that SSI would "render authenticated and accurate statements of its net receipts, which shall be signed by a duly authorized representative of SSI." *Id.*

In the Complaint, Topline, Inc. asserts that SSI breached the CDA in a number of ways. ECF 1, ¶ 56. For example, Topline, Inc. claims that SSI deducted "from royalties paid to Topline[, Inc.] certain costs and expenses, such as printing, binding, invoicing, and administrative fees, that are not permissible deductions from 'net receipts' within the meaning of paragraph 7(a) of the CDA . . . ." *Id.* Topline, Inc. also asserts that SSI sold "the SSI Negotiation Program in bad faith and in a manner intentionally calculated to deprive Topline[, Inc.] of its bargained-for expectation of royalties under the CDA." *Id.*

### D. *Building Your Sales Factory*

In January 2011, Topline, Inc. and/or Kraner registered a work with the United States Copyright Office, titled *Building Your Sales Factory.*[7] ECF 312, ¶ 42; *see* ECF 312-9 (Screenshots of United States Copyright Office, *Public Catalog*, Registration No. TX7373270) ("Copyright Record"); ECF 312-11 (*Building Your Sales Factory* or "BYSF").[8] The Copyright Record for *Building Your Sales Factory* lists "TopLine Solutions, Inc." as the "Copyright Claimant"; the date of creation as 2011; the date of publication as January 15, 2011; the author as "Steve Kraner"; and the Type of Work as "Text." *See* ECF 312-9. The Copyright Record

---

[7] SSI is inconsistent in its allegations as to who registered the Copyright. For example, in paragraph 42 of the Counterclaim (ECF 312), SSI alleges that *both* Topline, Inc. *and* Kraner registered *Building Your Sales Factory*. But, in paragraphs 47 and 48 of ECF 312, SSI asserts that only Topline, Inc. registered *Building Your Sales Factory*. In light of ¶ 42, I shall assume that SSI has alleged that both Topline, Inc. and Kraner are responsible for the registration of *Building Your Sales Factory*.

[8] ECF 312-11 is filed only in paper format. In ECF 320-1 at 10, Topline asserts that on or about January 24, 2011, "Topline[, Inc.] filed an application for a copyright." They point out that *Building Your Sales Factory* was filed as a "'revised compilation.'" *Id.* Moreover, Topline asserts that the Copyright Deposit Specimen "contained significant content" from the "Course Materials" identified in the Confidential Disclosure Agreement. *Id.*

provides that the "basis of claim" is "revised compilation." *See id.* Additionally, as to "Pre-existing Material", the registration states "previous version." *See id.*

Of import here, SSI maintains that it only learned of the registration of *Building Your Sales Factory* on or about May 13, 2016, when Margaret Stevens Jacks, its Executive Vice President of Legal and Administration, searched the Copyright Office's online public catalog. ECF 312, ¶ 45. Thereafter, on or about May 26, 2016, SSI, through counsel, sent Topline, Inc. a Notice of Default and requested that Topline, Inc. submit a copy of *Building Your Sales Factory* to SSI. *Id.* ¶ 47. On or about July 14, 2016, counsel for Topline, Inc. provided SSI with a copy of a 98-page document titled *The Reluctant Salesman, By Steven Kraner*, 2 April 2011. ECF 312, ¶ 48; *see* ECF 312-10 (*The Reluctant Salesman*). According to SSI, Topline, Inc.'s counsel "purported it to be the copyrighted publication entitled *Building Your Sales Factory*." ECF 312, ¶ 48.

Because counsel for Topline, Inc. provided the *Reluctant Salesman*, but the Copyright Record reflected registration of *Building Your Sales Factory*, SSI requested from the Copyright Office a certified copy of the work registered by Topline as BYSF. ECF 312, ¶ 49. SSI received the certified copy of BYSF on or about August 10, 2016. *Id.* ¶ 50; *see* ECF 312-11.

The copy of *Building Your Sales Factory* provided by the Copyright Office is a document consisting of 451 pages with fourteen sections. *See* ECF 312-11; *see also* ECF 312, ¶ 50. The document is not paginated and appears to include items from a mix of sources. Notably, several of the sections of BYSF indicate that the contents are the intellectual property of SSI. *See id.* For example, each page of the section "The Parature Sales Process" includes "©2007 Sandler Sales Institute All Rights Reserved." Moreover, ECF 312-11 contains a variety of handwritten pages. *See id.*

According to SSI, "[t]he certified copy of *Building Your Sales Factory* included numerous pages of Sandler Proprietary Material which had not been disclosed to SSI by Topline, [Inc.,] including: (a) pages from the HTBC Materials; and (b) what appears to be a customized variation of the HTBC Materials for a client by the name of Parature, which was not ordered from or provided by SSI." ECF 312, ¶ 51. Moreover, SSI claims that "[t]he use of Sandler's [copyrighted] Proprietary Assets as pre-existing material in Plaintiff's copyright application was unauthorized and without Sandler's consent." *Id.* ¶ 52. And, SSI asserts that it owns the copyright to its "Proprietary Assets." *Id.* ¶ 53; *see* ECF 312-12 (SSI certificate of copyright registration).

On what appears to be the first page of BYSF, the words "By Steve Kraner" appear to the right of the title. *Id.* at 3. Additionally, "Steve Kraner | © 2010 TopLine Solutions, Inc." appears at the bottom of many pages. *See id.* And, above the by-line on the first page is a photograph. *See id.* A facsimile of the top-third of page one of BYSF is included below.



## II.     Procedural History

As indicated, Topline, Inc. filed suit on November 19, 2009. ECF 1. On April 6, 2010, Judge Messitte granted SSI's motion to transfer the case to the Northern Division (ECF 22), and

the case was reassigned to Judge Legg.  ECF 23.  SSI answered the Complaint on April 19, 2010.

ECF 24.  Topline, Inc. moved to strike SSI's affirmative defenses on June 3, 2010.  ECF 29.

Judge Legg granted the motion to strike by Order of July 27, 2010 (ECF 35), and SSI docketed

its First Amended Answer on August 12, 2010.  ECF 37.

Throughout the first half of 2011, the parties engaged in dogged discovery disputes.  *See*

docket.  Then, in November 2011, the parties filed cross motions for partial summary judgment.

ECF 88 (SSI); ECF 89 (Topline, Inc.).  In particular, SSI sought summary judgment as to counts

II, V, and VI, of the Complaint, pertaining to the HTBCA (*see* ECF 88), and Topline, Inc. sought

summary judgment as to counts I and II of the Complaint, for breach of the CDA and the

HTBCA.  *See* ECF 89.[9]

Judge Legg held a hearing on the cross motions for partial summary judgment on March

28, 2012.  *See* ECF 245 (transcript of 3/28/2012 hearing).  His rulings followed on April 18,

2012 (ECF 105) and April 30, 2012 (ECF 106).  In ECF 105, Judge Legg granted summary

judgment in favor of Topline, Inc. as to the claim for breach of the CDA (Count I of the

Complaint).  *Id.*  In ECF 106, Judge Legg denied both cross motions with respect to counts II, V,

and VI of the Complaint, concerning the alleged breaches of the HTBCA.  *Id.*

In particular, in ECF 105, concerning Topline, Inc.'s claim that SSI breached the CDA,

Judge Legg found that SSI had breached the CDA by:

(1)     "deducting shipping and printing costs from net receipts in calculating the royalty

        payments owed to Topline" (ECF 105 at 3);

(2)     "failing to pay required royalties on sales of SSI Negotiation Program materials to

        [SSI's] in-house clients"; (*id.*);

---

[9] Discovery remained open during the pendency of the partial summary judgment
motions.  ECF 82.

(3)      "failing to acknowledge or account for the use of the SSI Negotiation Program by its international franchisees" (*id.* at 4);

(4)      "making royalty payments late and delivering inaccurate royalty statements that were not signed by a duly authorized representative of SSI" (*id.* at 5-6); and

(5)      "failing to notify or consult with Topline as to the amount SSI charges members of the Sandler Franchise Network for access to the SSI Negotiation Program through its FTP server" (*id.* at 6).

Judge Legg indicated that he was "inclined to appoint a Federal Rule of Evidence 706 accounting expert to conduct an accounting." ECF 105 at 6-7. He explained, *id.*: "The Court is inclined to take this step because the protracted, unfruitful discovery process in the case suggests that discovery on this issue would be unlikely to produce answers."

With respect to the cross-motions for partial summary judgment, Judge Legg found ambiguities in the HTBCA that could not be resolved on summary judgment. ECF 106 at 5. He said, *id.* at 1-2:

> Topline contends that the HTBC Agreement gives it the exclusive right to use the "Subject Proprietary Assets." *See* HTBC Agreement Explanatory Statement ¶ G; § 2.3. According to Topline, these assets include (i) all pages of the Manual, as that document is updated and modified from time to time, and (ii) the Audio and the PowerPoint materials, as they are modified from time to time. Topline reads the Agreement as conferring on Topline and Ram Das the exclusive right to sell and present any materials in the Manual, whether those materials were created by SSI, Steve Kraner (the owner of Topline), or Guru Ganesha Khalsa (the owner of Ram Das).
>
> *      *      *
>
> SSI contends that the Subject Proprietary Assets include the following: (i) the version of the Manual attached to the Agreement as Exhibit A, and (ii) the Audio and the PowerPoint materials as modified in accordance with § 3.1 of the Agreement. Under this interpretation, SSI claims the right to sell or distribute modified versions of the Manual, including those portions created by Kraner and

Khalsa. For instance, SSI argues that it can defeat Topline and Ram Das's exclusive right to use and sell the Manual by changing a single page.

Judge Legg determined, *id.* at 3:

> The Court finds the HTBC Agreement to be ambiguous. Both Topline and SSI's literal interpretations find support in the language of the Agreement. Yet, both literal interpretations produce unreasonable, apparently unintended results. Under Topline's reading, SSI would have relinquished the right to use or sell a substantial portion of SSI's intellectual property. Under SSI's reading, SSI could defeat Topline's exclusive rights to use and sell the materials developed by Kraner and Khalsa merely by making cosmetic changes.

Thereafter, the parties disagreed as to the appointment of the accounting expert. *See, e.g.*, ECF 108; ECF 109; ECF 114. On May 22, 2012, Judge Legg appointed Barry Bondroff, C.P.A., as an independent accounting expert, pursuant to Fed. R. Evid. 706. ECF 111. Judge Legg directed Bondroff to submit a report and to testify at trial as to: 1) the amount of damages to which Topline is entitled as a result of SSI's deduction of printing and shipping costs from net receipts before calculating royalty payments under § 7(a) of the CDA; 2) whether royalties due to Topline under the CDA in connection with in-house client sales were properly accounted for and paid by SSI; and 3) a "retroactive accounting of royalties owed to Topline on the percentage of international franchise fees attributable to the Negotiation Program." *Id.* Bondroff submitted his report on August 9, 2013. ECF 152. He submitted a supplement on March 10, 2016 (ECF 233), responding to plaintiff's exceptions to the prior findings. *See* ECF 172.

In the interim, on October 25, 2012, the case was reassigned to Judge Quarles. *See* docket. Shortly thereafter, on November 16, 2012, the parties filed a joint motion to reopen discovery with respect to the HTBCA. ECF 137. Judge Quarles approved the motion by Order of the same day. ECF 138. Throughout 2013, 2014, 2015, and the first half of 2016, the parties were embroiled in extensive disputes regarding Bondroff's accounting and as to discovery. *See, e.g.*, ECF 151; ECF 165; ECF 178; ECF 194; ECF 208; ECF 225. Judge Quarles resolved

disputes pertaining to bifurcation of claims (ECF 194; ECF 204) and determined that Topline was entitled to a jury trial as to Count II of the Complaint, alleging breach of the HTBCA. ECF 204; ECF 205.

The case was reassigned to me on January 22, 2016, due to the retirement of Judge Quarles. *See* docket. After telephone conferences with counsel on June 15, 2016 and June 27, 2016 (*see* docket), I scheduled the case for trial, to begin January 30, 2017. ECF 241.

SSI filed a second motion for partial summary judgment on August 8, 2016 (ECF 248), supported by a memorandum (ECF 248-1) (collectively, "Second Summary Judgment Motion") and many exhibits. *See* ECF 248-3 through ECF 248-19. In particular, SSI renewed its motion for partial summary judgment with respect to the HTBCA. *Id.* Then, on August 30, 2016, SSI filed a motion for leave to file a counterclaim, third-party complaint, and second amended answer. ECF 253 ("Motion to Amend").

Because of his availability, Judge Motz generously agreed to address SSI's Second Summary Judgment Motion and Motion to Amend. He held a motions hearing on November 30, 2016. *See* ECF 292. As noted, at the conclusion of the hearing, Judge Motz granted both motions. *See also* ECF 293.

As to the claim of Topline, Inc. that SSI breached the HTBCA, Judge Motz said, ECF 308 (11/30/16 hearing transcript) at 62:

> I don't understand how Mr. Kraner thought that he bought into the concepts. I mean, the agreement and mutual release – and I'm going to call it that because that's what it's called – pertains to, it defines the subject, what the subject matter is. And I do not find that he, Mr. Kraner, bought the concepts that merge. I just don't see that. So I'm going to grant the motion for partial summary judgment.

And, with respect to the Motion to Amend, Judge Motz stated, *id.* at 62-63:

I'm going to grant the motion for leave to file a counterclaim. I'm going to leave it up to Judge Hollander to decide whether or not that requires a postponement [of trial]. But clearly, the counterclaim can be filed. If there are other issues that are going to be, that the plaintiff wants to raise by filing a motion to dismiss, so be it . . . . I'll leave it up to the plaintiff whether to file a motion to dismiss.

On December 8, 2016, I held a telephone conference with counsel to discuss the effect of Judge Motz's rulings on the trial schedule. *See* docket; ECF 311.[10] Among other things, I set a discovery deadline of April 10, 2017, limited to the Counterclaim; set a deadline of April 28, 2017, for dispositive motions[11]; and scheduled trial to begin on August 7, 2017. ECF 311.[12] At the end of the telephone conference, counsel for Topline indicated his intent to note an interlocutory appeal, pursuant to 28 U.S.C. § 1292(a)(1), as to Judge Motz's ruling on the Second Summary Judgment Motion. The appeal was filed on December 23, 2016. ECF 316.

Thereafter, I asked counsel to inform the Court of their views as to whether the interlocutory appeal deprived the Court of jurisdiction with respect to the Counterclaim and, even if the Court retained jurisdiction, whether the case should be stayed pending the outcome of the appeal. ECF 317. Before responding, Topline filed the motions at issue. *See* ECF 320; ECF 321. The parties responded to my jurisdiction inquiry in late January 2017, and disagreed as to whether an appeal would divest the Court of jurisdiction to consider matters pertaining to the Counterclaim and whether the case should be stayed. ECF 325 (SSI); ECF 326 (Topline). I

---

[10] Judge Motz's ruling as to Count II of the Complaint rendered moot SSI's motion for reconsideration (ECF 285) as to the Court's denial (ECF 280) of SSI's motion to strike the jury trial as to Count II (ECF 279). *See also* ECF 204; ECF 205; ECF 288; ECF 293; ECF 300.

[11] By Order of April 21, 2017 (ECF 352), I stayed the summary judgment deadline pending resolution of the Motion to Dismiss and the Motion to Strike.

[12] At the request of counsel for SSI (ECF 314), the trial date was subsequently changed to August 14, 2017. ECF 315.

subsequently determined that the Court was not divested of jurisdiction to consider the Motion to Dismiss and the Motion to Strike, and I declined to stay the case. ECF 330.

In any event, the Fourth Circuit dismissed the appeal on March 14, 2017. ECF 343. It concluded that Topline, Inc. did not appeal from a final order and that it had not demonstrated irreparable harm absent an immediate appeal. *Id.* at 3-4; *see also* 28 U.S.C. § 1292(a)(1).

In the meantime, the parties engaged in discovery as to the Counterclaim. In doing so, they have continued their entrenched practice of failing to cooperate with each other – a practice that has plagued this case since its inception. *See, e.g.*, ECF 332 through ECF 340; *see also* ECF 291 (observing that a "'scorched-earth' style of litigation" dominates the case).

On March 16, 2017, pursuant to Fed. R. Civ. P. 72(a), SSI objected to Judge Coulson's resolution of a discovery dispute (ECF 340) concerning, *inter alia*, the scope of discovery as to the Counterclaim. ECF 344 ("Objection"). I denied the Objection by Memorandum (ECF 348) and Order (ECF 349) of April 3, 2017.

### III. Legal Standards and Principles

Topline, Inc. and Kraner assert multiple grounds in support of their Motion to Dismiss the Counterclaim. *See* ECF 320-1. They argue that SSI has failed to allege facts sufficient to support a claim that Kraner is personally liable as to any of the counterclaims or third-party claims; counts I, II, and III of the Counterclaim are barred by limitations; and each of the four counts of the Counterclaim fails to state a claim for relief. *See id.*

Before addressing the challenges raised in the Motion to Dismiss, there are several preliminary matters that I shall review, because they provide a framework for my analysis.

## A. Choice of Law

The parties did not address whether federal or state law applies to review of the state law claims. Nor have they identified which state's law would apply.

The Counterclaim is predicated on the Court's federal question jurisdiction (*see* 28 U.S.C. § 1331) and the Court's diversity jurisdiction (28 U.S.C. § 1332) or supplemental jurisdiction (28 U.S.C. § 1367). In reviewing state law claims brought under diversity or supplemental jurisdiction, federal courts apply federal procedural law and the substantive law of the state in which the proceeding is brought, including the forum state's choice-of-law rules. *See, e.g.*, *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *see also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); C. Wright & A. Miller, *Fed. Practice and Procedure*, § 3567 ("Wright & Miller"). As to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995).

Both the HTBCA (ECF 312-7 at 12, ¶ 11.2) and the Franchise Agreements (*e.g.*, ECF 312-4 at 25, ¶ 14.1; ECF 312-5 at 31, ¶ 14.1) provide that they are to be governed by Maryland law. Counts I, II, and IV assert claims under Maryland law. Count III asserts a claim under federal law. Accordingly, Maryland substantive law applies as to counts I, II, and IV, and federal substantive law applies as to Count III.

## B.  Standard of Review under Rule 12(b)(6)

Topline has moved to dismiss the Counterclaim under Rule 12(b)(6).  Such a motion tests the legal sufficiency of a complaint.  *Goines v. Valley Cmty Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, ___ U.S. ____, 133 S. Ct. 1709 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

A Rule 12(b)(6) motion constitutes an assertion by a defendant (or a counter defendant) that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl., Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).  But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, ___ U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual allegations contained in the complaint'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, ___ U.S. ____, 132 S. Ct. 1960 (2012).

In general, courts do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The purpose of the rule is to ensure that defendants are

"given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555–56 (2007). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] on the face of the complaint.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman* ).

Under limited exceptions, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015). A court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits . . . ." *Goines*, 822 F.3d at 166 (citations omitted); *see U.S. ex rel. Oberg*, 745 F.3d at 136 (quoting *Philips v. Pitt Cty Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations

omitted); *see also Int'l Longshoreman's Ass'n., Local 333 v. Int'l Longshoremen's Ass'n., AFL-CIO*, ___ Fed. App'x ___, 2017 WL 1628979 (4th Cir. May 2, 2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). "When the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

Under the principles articulated above, I may consider the eleven exhibits that SSI attached to its Counterclaim. ECF 312-2 through ECF 312-12.

Topline has appended as an exhibit to the Motion to Dismiss "the e-mail chain that culminated in the communication referenced and relied on in paragraph 48 of . . . SSI's Amended Counterclaim[]." ECF 320-1 at 10; *see* ECF 320-2 (exhibit). In order to consider ECF 320-2, I must determine whether it is integral to the Counterclaim.

In its Counterclaim, SSI claims that "Topline and Kraner, through their counsel, falsely represented to SSI that the manual, The Reluctant Salesman, was the same item that Topline and

Kraner registered with the Copyright Office as the program Building Your Sales Factory." ECF 312, ¶ 73. The email chain is the correspondence that underlies SSI's claim for fraud/intentional misrepresentation. *See id.* ¶¶ 72-80. Because the email chain is central to the claim of misrepresentation, it is integral to the Counterclaim. And, because there is no dispute regarding its authenticity, it can be considered by the Court, without converting the Motion to Dismiss to one for summary judgment. *Goines*, 822 F.3d at 166; *see also Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) ("'What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.'") (quoting *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997)); *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 409 (E.D.N.C. 2015) (applying *Am. Chiropractic Ass'n*); *Fisher v. Md. Dep't of Pub. Safety & Corr. Servs.*, JFM-10-0206, 2010 WL 2732334, at *2 (D. Md. July 8, 2010) ("[C]ourts have found integral the allegedly fraudulent document in a fraud action, the allegedly libelous magazine article in a libel action, and the documents that 'constitute the core of the parties' contractual relationship' in a breach of contract dispute.").

## C. Principles of Contract Construction

The parties' disputes center on various contractual agreements. In analyzing the issues, it is helpful to review the principles of contract construction.[13] Under the *Erie* doctrine, which is applicable here, questions of contract interpretation are substantive, and thus are properly

___

[13] The parties did not address these principles in their submissions.

considered under Maryland law. *See Transcon. & W. Air, Inc. v. Koppal*, 345 U.S. 656-57 (1953); *Baney Corp. v. Agilysis NV, LLC*, 773 F. Supp. 2d 593, 600 (D. Md. 2011).

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, ___ Md. App. ___, ___ A. 3d ___, 2017 WL 1174862, at *3 (Mar. 29, 2017); *see Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014) (citing *Towson Univ. v. Conte,* 384 Md. 68, 78, 862 A.2d 941, 946 (2004)); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, ___ Md. App. ___, ___ A.3d ___, 2017 WL 1507671, at *2 (April 27, 2017). This includes the determination of whether a contract is ambiguous. *Sy–Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'" *Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232 (2013) (citation omitted). To determine the parties' intentions, courts look first to the written language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894 A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court must, as its first step, determine from the language of the agreement what a reasonable person in the position of the parties would have meant at the time the agreement was effectuated."), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law of objective contract interpretation, which specifies that 'clear and unambiguous language' in an

agreement 'will not give way to what the parties thought the agreement meant or was intended to mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Baltimore St. Assocs. LLC*, No. 882, Sept. Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted) (unpublished); *see Cochran v. Norkunas*, 398 Md. 1, 16, 919 A.2d 700, 709 (2007); *Huggins v. Huggins & Harrison, Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration omitted). The court's "task, therefore, when interpreting a contract, is not to discern the actual mindset of the parties at the time of the agreement . . . ." *Dumbarton Imp. Ass'n, Inc.*, 434 Md. at 52, 73 A.3d at 232. Rather, the court is to "'determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.'" *Id.* (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)).

As indicated, to determine the parties' intentions, courts first look to the written language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632–33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire & Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor,* 109 Md. App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md. 601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Notably, ambiguity in a contract does not exist "simply because, in litigation, the parties offer different meanings to the language." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751, 929 A.2d 932, 952 (2007). Rather, "[u]nder the objective view [of contract interpretation], a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d at 363 (citation omitted); *see Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 87, 5 A.3d 683, 690-91 (2010) (citation omitted); *Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy–Lene of Washington,* 376 Md. at 167, 829 A.2d at 547 (citations omitted); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999).

Based on well established principles, "[if] the language employed in a contract is unambiguous, a court shall give effect to its plain meaning." *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted). No further construction or consideration of extrinsic evidence is

necessary. *Id.* (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006).

Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'" *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship,* 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (quoting *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 596-97, 578 A.2d 1202, 1208 (1990)); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.,* 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010). "[I]f ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract.'" *Clendenin*, 390 Md. at 459-60, 889 A.2d at 394 (quoting *Collier v. MD–Individual Practice Association, Inc.,* 327 Md. 1, 6, 607 A.2d 537, 539 (1992)) (further citations omitted). In the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC,* 875 F. Supp. 2d 511, 526 (D. Md. 2012) (*quoting Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 234 (4th Cir. 2007)).

### D.  The Copyright Act

The primary thrust of the Counterclaim concerns the registration of a copyright. Therefore, I pause to review portions of the Copyright Act, 17 U.S.C. §§ 101, *et seq.* ("Act"), and relevant principles. The Act is discussed in more detail, *infra*.

Copyright protection applies to "original works of authorship fixed in any tangible medium of expression . . . ." 17 U.S.C. § 102. The Fourth Circuit explained the purpose of the Act in *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003) (some modifications in original):

> The Copyright Act, enacted on the authority of Article I, § 8, of the Constitution, confers on creators of original works a limited monopoly in their works of authorship to advance an important public purpose. "It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). The reward to the owner is "a secondary consideration" that serves the primary public purpose of "induc[ing] release to the public of the products of [the author's or artist's] creative genius." *Id.* (quoting *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948)); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546 (1985).

"'[T]he Copyright Act grants the copyright holder 'exclusive' rights to use and to authorize the use of his work in five qualified ways, including reproduction of the copyrighted work in copies.'" *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432-33 (1984)) (alteration in *CoStar*). Under the Act, "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author . . . ." 17 U.S.C. § 501.

In general, to establish copyright infringement "'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *CoStar*, 373 F.3d at 549 (quoting *Feist Publications., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *accord Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 709 (D. Md. 2012), *aff'd*, 722 F.3d 591 (4th Cir. 2013).

To show ownership of a valid copyright, a plaintiff must supply "proof of originality and copyrightability." *See Darden v. Peters*, 488 F.3d 277, 285 (4th Cir. 2007) (internal quotation

marks omitted). "A work is original when it has been 'independently created by the author (as opposed to copied from other works), and . . . possesses at least some minimal degree of creativity.'" *Edgerton v. UPI Holdings*, No. CCB-09-1825, 2010 WL 2651304, at *4 (D. Md. July 1, 2010) (quoting *Feist*, 499 U.S. at 345). The Supreme Court has said: "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble, or obvious it might be." *Feist*, 499 U.S. at 345 (internal quotation marks omitted).

"The Copyright Act specifies that copyrights may extend to compilations[] and derivative works,[] but 'only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work . . . .'" *Edgerton*, 2010 WL 2651304, at *4 (quoting 17 U.S.C. § 103(b)). Regarding the originality of a compilation of facts, the *Feist* Court observed that "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws." *Feist*, 499 U.S. at 348.

## IV.    Discussion

In its Counterclaim, SSI asserts four counts against Topline, Inc. as counter-defendant, and joins Kraner as a third-party defendant as to counts I, III, and IV. *See* ECF 312.

In Count I, SSI claims that Topline breached ¶ 4.1.2 of the HTBCA by registering portions of the HTBC Materials with the Copyright Office (*id.* ¶ 57) and also alleges that Topline breached ¶ 4.2 of the HTBCA by "producing variations of the HTBC Materials without purchasing [those materials] from SSI. . . ." *Id.* ¶ 57. In Count II, SSI alleges that Topline, Inc. breached ¶ 5.1 of the Franchise Agreements by producing *Building Your Sales Factory* without prior written permission from SSI. *Id.* ¶ 62. In Count III, SSI asserts that Topline infringed on SSI's copyright by producing and registering BYSF. ECF 312 ¶¶ 64-71. And, in Count IV,

Topline presents a claim for common law fraud based on two alleged misrepresentations. *Id.* ¶¶ 72-80.

## A. Law of the Case Doctrine

In SSI's Opposition to the Motion to Dismiss, SSI urges the Court to deny the Motion to Dismiss based on the law of the case doctrine. SSI argues, *inter alia*, that the law of the case doctrine bars Topline from "recycling arguments that the court found unpersuasive in granting Sandler's motion for leave less than two months ago." ECF 324 at 6; *see Everett v. Pitt Cnty Bd. of Educ.*, 788 F.3d 132, 142 (4th Cir. 2015). In short, SSI contends that when Judge Motz granted the Motion for Leave, he necessarily considered the precise issues now advanced by Topline. ECF 324 at 6-10. According to SSI, the futility prong that is embodied in Fed. R. Civ. P 15(a) is similar to the standard that governs a motion to dismiss. *See* Wright & Miller § 1487 ("[S]everal courts have held that if a complaint as amended could not withstand a motion to dismiss or summary judgment, then the amendment should be denied as futile.").

In general, the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Everett*, 788 F.3d at 142. But, Topline disputes the applicability of the law of the case doctrine to a district court's review of its own decisions. *See* ECF 331 at 2-3; Fed. R. Civ. P. 54(b); Wright & Miller § 4478.1.

Notably, the law-of-the-case doctrine "applies both to questions actually decided as well as to those decided by necessary implication, [but] it does not reach questions which might have been decided but were not." *Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (internal quotation marks omitted); *see also, e.g., Farina v. Nokia Inc.*, 625 F.3d 97, 117 n.21 (3d

Cir. 2010) ("Law of the case only extends to issues that were actually decided in prior proceedings.").

After granting the Motion to Amend, Judge Motz said: "If there are other issues that are going to be, that the plaintiff wants to raise by filing a motion to dismiss, so be it." *Id.* at 62. And, before concluding the hearing, Judge Motz reiterated: "I'll leave it up to the plaintiff whether to file a motion to dismiss." ECF 308 at 63. This language indicates that Judge Motz specifically deferred consideration and resolution of the futility issue. Had Judge Motz considered the futility issue, there would have been no need for him twice to invite Topline, Inc. to move to dismiss the Counterclaim. Because it does not appear that Judge Motz necessarily considered the issue of futility in making his decision, the law of the case doctrine would be inapplicable, even under SSI's interpretation.

Moreover, Kraner was only recently named as a third-party defendant. He was not a party to the case during the preceding seven years. It would be inequitable to bind him to the futility prong in connection with the Motion to Amend if he was not a party at that time, and thus not able to litigate the issue.

In any event, as Topline points out, it is an *appellate* court that establishes the law of the case. ECF 331 at 2. "[W]hen a decision of an appellate court establishes 'the law of the case,' it 'must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.'" *Sejman*, 845 F.2d at 69 (quoting *EEOC v. International Longshoremen's Assoc.*, 623 F.2d 1054 (5th Cir. 1980)); *see also United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (clarifying that the doctrine

applies "once the decision of an appellate court establishes the law of the case") (internal quotation marks omitted).

I agree with Topline that a trial court's rulings are not "immune from reexamination" by the trial judge. ECF 331 at 3. Fed. R. Civ. P. 54(b) states: "[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties **and may be revised at any time** before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." (Emphasis added). Therefore, a trial judge may revisit his or her own rulings. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) (noting that "every order short of a final decree is subject to reopening at the discretion of the district judge"); *see also Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997) ("Interlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment.").

In sum, the law of the case doctrine does not provide a basis to deny the Motion to Dismiss.

### B. Statutes of Limitations: Counts I, II, and III

Topline argues that counts I, II, and III of the Counterclaim are subject to dismissal because they were not brought within the time specified by the applicable statutes of limitations. ECF 320-1 at 14-18. In particular, Topline argues that counts I and II, claiming breach of contract, were not brought within the three-year statute of limitations for civil actions in Maryland, as set forth in Md. Code (2013 Repl. Vol., 2016 Supp.), §5-101 of the Courts &

Judicial Proceedings Article ("C.J.").[14]  Further, Topline contends that Count III, claiming a copyright violation, was not brought within the three-year statute of limitations applicable to copyright claims under the Copyright Act, 17 U.S.C. § 507.  ECF 320-1 at 15.

In particular, Topline argues in the Motion to Dismiss that SSI "was on notice in October 2010 that Topline would be conducting training using documentation discussing the ideas and concepts summarized in the 'Building Your Sales Factory' overview that it had received."  ECF 320-1 at 17.  And, Topline contends that "it is not credible that SSI could only have discovered Topline's copyright registration in May 2016, when the fact of that registration has been publicly available on the Copyright Office's website since January 2011."  *Id.*

C.J. § 5-101 is applicable to counts I and II.  It provides, *id.*:  "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."

"Although the statute of limitations for breach of contract generally commences on the date of breach, for that is when the cause of action 'accrues,' that date may be extended in Maryland by the 'discovery rule,' which provides that the limitations period does not begin until the plaintiff learned or should have learned of the breach."  *Goodman*, *supra*, 494 F.3d at 465; *see also Poffenberger v. Risser*, 290 Md. 631, 324, 431 A.2d 677, 679 (1981).  In *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167–68, 857 A.2d 1095, 1104 (2004), the Maryland Court of Appeals explained, *id.* (internal citations omitted; alterations in original):

> Under Maryland's discovery rule, the statute of limitations does not begin
> to accrue on a claim until the plaintiff knows or should know of the potential

---

[14] As indicated, in diversity cases federal courts apply federal procedural law and state substantive law.  *See, e.g.*, *Leichling*, *supra*, 842 F.3d at 851.  Similarly, "[s]upplemental claims are governed by state substantive law."  Wright & Miller § 3567.  Notably, issues as to limitations are ordinarily considered to be substantive.  *See, e.g.*, *Guaranty Trust Co of N.Y. v. York*, 326 U.S. 99, 110-12 (1945); *Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999).

claim. The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period. This standard, however, does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on "inquiry notice." A plaintiff is put on inquiry notice when he, she, or it possesses "facts sufficient to cause a reasonable person to investigate further, and . . . [that] a diligent investigation would have revealed that the plaintiffs were victims of . . . the alleged tort."

*See also Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95–96, 756 A.2d 963, 973 (2000) ("The discovery rule tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury. Thus, before an action is said to have accrued, a plaintiff must have notice of the nature and cause of his or her injury.").

Notably, the Maryland Court of Appeals has said that notice also includes inquiry notice. In *Poffenberger*, 290 Md. at 637, 431 A.2d at 681, the court determined that "the discovery rule contemplates actual knowledge that is express cognition, or awareness implied from knowledge or circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice . . . ." (Internal quotations and citation omitted). Unlike constructive notice, inquiry notice, defined by the Maryland Court of Appeals as "circumstantial evidence from which notice may be inferred", is sufficient to trigger the running of the statute of limitations under the discovery rule." *Windesheim v. Larocca*, 443 Md. 312, 327, 116 A.3d 954, 963 (2015). In contrast, "constructive notice does not trigger the running of the statute of limitations under the discovery rule." *Id.*

"Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense . . . ." *Goodman*, 494 F.3d at 464 (citing *Newell v. Richards*, 323 Md. 717, 594 A.2d 1152, 1156 (1991)); *accord Woodson v. Allstate Ins. Co.*, ___ F.3d ___, 2017 WL 1660663, at *5 (4th Cir. May 3, 2017); *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474

(4th Cir. 2005). "The burden of establishing the affirmative defense rests on the defendant." *Goodman*, 494 F.3d at 464.

A claim of limitations may be raised in an answer, under Rule 8(c)(1), or by a motion pursuant to Rule 12(b)(6). But, a motion under Rule 12(b)(6) is appropriate only "if the time bar is apparent on the face of the complaint." *Dean*, 395 F.3d at 474 (citing *Bethel v. Jendoco Construction Corp.,* 570 F.2d 1168 (3d Cir.1978)). Whether "plaintiff's failure to discover his cause of action was due to failure on his part to use due diligence, or to the fact that defendant so concealed the wrong that plaintiff was unable to discover it by the exercise of due diligence, is ordinarily a question of fact for the jury." *O'Hara v. Kovens*, 305 Md. 280, 294-95, 503 A.2d 1313, 1320 (1986) (internal citation and quotations omitted).

In *Goodman*, *supra*, 494 F.3d 458, the Fourth Circuit considered the application of Maryland's discovery rule to a limitations claim made in a motion to dismiss under Rule 12(b)(6). The district court had dismissed plaintiff's amended complaint on the ground that it was barred by limitations. *Id.* at 464. In reversing the district court, Judge Niemeyer, writing for the majority of the en banc Court, said, *id.* at 465-66 (emphasis in *Goodman*):

> While [plaintiff] might ultimately have to *prove* when he discovered a breach, he was not obligated to plead discovery of the breach in his complaint when the affirmative defense had yet to be demonstrated in the complaint or asserted by the defendants. If the defendants wished to dispose of the complaint on its face *before* asserting their affirmative defense, on the ground that their affirmative defense was evident in the complaint, they had to show also that the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint. "[O]nce a claim has been stated adequately, it may be supported by showing *any set of facts* consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) (emphasis added). To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised.

It may well be that the evidence will establish that the claims in Count I and Count II accrued when the copyright was publicly registered in 2011. At this juncture, however, *Goodman* compels the Court to reject Topline's limitations defense as to Count I and Count II, even though the Counterclaim was filed more than three years after the alleged breach of the contract. SSI is not required to plead in the Counterclaim the reasons for its delay in discovering the alleged breach. *See id.* at 465-66. As the Fourth Circuit said in *Goodman*: "To require otherwise would require a plaintiff to plead affirmatively in his complaint matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Id.*at 466.

The Copyright Act is pertinent to Count III. The statute of limitations with respect to the Act is codified at 17 U.S.C. § 507(b), which provides, *id.*: "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." *See also Petrella v. Metro-Goldwyn-Mayer, Inc.*, ___ U.S. ___, 134 S. Ct. 1962, 1968-70 (2014) (discussing the statute of limitations for the Copyright Act). Like Maryland's statute of limitations for breach of contract, "nine Courts of Appeals have adopted . . . a 'discovery rule,' which starts the limitations period when 'the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim.'" *Petrella*, 134 S. Ct. at 1969 n. 4 (quoting *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433 (3d Cir. 2009)); *see also Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 796 (4th Cir. 2001) ("[A copyright] claim accrues when one has knowledge of a violation or is chargeable with such knowledge.") (internal citation and quotations omitted).

SSI has averred that it only discovered the alleged infringement in 2016. For the reasons stated with respect to counts I and II, Topline's Motion to Dismiss must be denied as to the claim that Count III is barred by the limitations under the Copyright Act. Although the Counterclaim

was not filed within three years of the alleged copyright infringement, SSI is not required "to plead affirmatively in [its Counterclaim] matters that might be responsive to affirmative defenses even before the affirmative defenses are raised." *Goodman*, 494 F.3d 466.

In view of the foregoing, I shall deny the Motion to Dismiss with respect to Topline's contention that counts I, II, and III of the Counterclaim are barred by limitations, because it is not apparent from the face of the Counterclaim that SSI knew of the copyright registration at least three years prior to filing the Counterlciam.

### C. Failure to State a Claim – Count I

In Count I of the Counterclaim, SSI claims that Topline breached the HTBCA. SSI contends that Topline, Inc. and Kraner agreed in the HTBCA that "SSI would be the sole and exclusive owner of the HTBC Materials and [they] agreed to never seek any copyright registration in the HTBC Materials . . . ." ECF 312 ¶ 55. According to SSI, Topline breached the HTBCA by registering portions of the HTBC Materials with the Copyright Office, in violation of paragraph 4.1.2. *Id.* ¶ 57. SSI also claims that Topline breached paragraph 4.2 of the HTBCA by "producing variations of the HTBC Materials without purchasing [those materials] from SSI. . . ." ECF 312, ¶ 57.

In the Motion to Dismiss, Topline asserts four grounds to support dismissal of Count I. ECF 320-1 at 18-27. First, Topline, Inc. and Kraner assert that they cannot be liable for a breach of paragraph 4.1.2 of the HTBCA because they did not register any of SSI's intellectual property with the Copyright Office. ECF 320-1 at 18-19. Second, they claim they are not liable for a breach of paragraph 4.2 of the HTBCA because SSI has failed to specify the portions of *Building Your Sales Factory* that were copied. *Id.* at 20. Third, Topline submits that SSI has failed to identify the losses proximately caused by Topline's conduct. *Id.* at 20-21. And fourth, Topline

claims that SSI's claim for breach of the HTBCA is barred by the doctrine of judicial estoppel. *Id.* at 21-27.

For the reasons that follow, I shall dismiss Count I of the Counterclaim to the extent that it alleges a violation of ¶ 4.1.2 of the HTBCA, because Topline did not "register" SSI's intellectual property with the Copyright Office when it registered *Building Your Sales Factory* as a collective work. But, I am satisfied that SSI has presented allegations sufficient to state a claim as to a violation of ¶ 4.2 of the HTBCA.

### 1. Copyright Registration

Paragraph 4.1.2 of the HTBCA provides: "No copyright registration has or will be obtained by Ram Das, Khalsa, Topline or Kraner in the Subject Proprietary Assets with the United States Copyright Office." ECF 312-7 at 6.

In the Motion to Dismiss, Topline disputes SSI's claim that Topline breached ¶ 4.1.2 of the HTBCA. Topline does not appear to contest that BYSF contains some HTBC Materials. *See* ECF 320-1 at 18. And, the parties do not dispute that Topline registered BYSF with the Copyright Office as a collective work. *See* ECF 312-9; ECF 324 at 11-14. But, Topline contends that the claim of breach fails as a matter of law because, in registering BYSF as a collective work, Topline, Inc. did not register the portions of that work for which it had no rights. ECF 320-1 at 18.

SSI disagrees. It argues that, "even if [Topline] could somehow establish that their copyright registration . . . is a 'collective work' under the Copyright Act, Sandler has plausibly alleged (and supported with documentary evidence) that the filing of [Topline's] Registration violated the [HTBCA]." ECF 324 at 13.

The critical question in determining whether SSI has stated a claim that Topline violated ¶ 4.1.2 of the HTBCA is whether Topline's registration of BYSF as a collective work effectively "registered" any Subject Proprietary Assets with the Copyright Office.

Section 101 of Title 17 of the U.S. Code defines a collective work as "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." *Id.* Under 17 U.S.C. § 103(b), "[t]he copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work . . . ." Moreover, the ownership of contributions to a collective work is defined by 17 U.S.C. § 201(c), which provides:

> Copyright in each separate contribution to a collective work is distinct from copyright in the collective work as a whole, and vests initially in the author of the contribution. In the absence of an express transfer of the copyright or of any rights under it, the owner of copyright in the collective work is presumed to have acquired only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in the same series.

The Supreme Court's review of collective works in *New York Times Co., Inc. v. Tasini*, 533 U.S. 483 (2001), provides insight as to the distinction between the registration of a copyright in a collective work and for a separate contribution to the work. The Court explained, *id.* at 494 (emphasis in *Tasini*) (some internal citations omitted):

> "Copyright in *each separate contribution to a collective work* is distinct from copyright in *the collective work as a whole* . . . ." § 201(c) (emphasis added). Copyright in the separate contribution "vests initially in the author of the contribution" (here, the freelancer). Copyright in the collective work vests in the collective author (here, the newspaper or magazine publisher) and extends only to the creative material contributed by that author, not to "the preexisting material employed in the work," § 103(b).

"Section 201(c) makes clear that copyright in an individual contribution vests initially in the author of that contribution and is distinct from copyright in the collective work as a whole." JANE C. GINSBURG & ROBERT A. GORMAN, COPYRIGHT LAW 68 (Federal Judicial Center 2012). Thus, *id.* (citation omitted):

> Absent an express written transfer from that author, the owner of a copyright in the collective work . . . does not own the copyright in the individual contribution, but is presumed to have acquired "only the privilege of reproducing and distributing the contribution as part of that particular collective work, any revision of that collective work, and any later collective work in that series."

The Second Circuit's decision in *Morris v. Bus. Concepts, Inc.*, 259 F.3d 65 (2d Cir. 2001), *reh'g denied*, 283 F.3d 502 (2002), *abrogated on other grounds*, *as recognized in Reed Elsevierier, Inc. v. Muchnick*, 559 U.S. 154 (2010), is pertinent. In *Morris*, plaintiff had written a series of articles for a column in *Allure* magazine, which was then owned by The Condé Nast Publications, Inc. ("Condé Nast"). *Id.* at 67. Condé Nast was an exclusive licensee of Morris's articles. *Id.* at 68. Condé Nast received Certificates of Registration from the Register of Copyrights for each issue of *Allure* in which Morris's articles were published, covering the issues as collective works. *Id.* at 67-68.

Morris learned that defendant had used her articles without permission, and brought suit, *inter alia*, for copyright infringement. *Id.* at 68. Defendant moved for summary judgment, contending that the requirement of registration of a work before a party can bring suit (*see* 17 U.S.C. § 411(a)) was not met because Condé Nast's registration of the collective work had not registered the article for plaintiff. 259 F.3d at 68. The district court granted summary judgment in favor of defendant. *Id.*

The Second Circuit affirmed. *Id.* at 73. After an exhaustive analysis, the court determined that the owner of an exclusive right to a work is not automatically the owner of the

copyright. *Id.* at 69-70. The court then concluded that Condé Nast was not a copyright owner of Morris's articles. *Id.* at 70. Pertinent to the case *sub judice*, the Second Circuit then considered the effect of the registration of a collective work by an entity that is not the copyright owner of some (or all) of the constituent parts of the collective work. *Id.* at 70-71. It reviewed Copyright Office Circular No. 62, titled "Copyright Registration for Single Serial Issues," and summarized the circular as providing, *Morris*, 259 F.3d at 71 (emphasis in original):

> [I]f *all* rights in a constituent work have not been transferred to the claimant—in other words, the claimant is simply an exclusive licensee—a collective work registration will not apply to the constituent work. If, on the other hand, all rights have been transferred to the claimant, making it the owner of the copyright, then the constituent work is included in the registration.[15]

The Second Circuit concluded: "Unless the copyright owner of a collective work also owns all the rights in a constituent part, a collective work registration will not extend to the constituent part." *Id.* at 71; *see also Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 284 (4th Cir. 2003), *cert. denied*, 540 U.S. 879, *abrogated on other grounds*, *as recognized in Reed Elsevier*, *Inc. v. Muchnick*, 559 U.S. 154 (2010) (adopting *Morris*, 259 F.3d 65). Therefore, the *Morris* Court affirmed the district court's grant of summary judgment for defendant, on the ground that plaintiff had never registered copyrights in the articles at issue. *Morris*, 259 F.3d at 71.

In denying rehearing, the Second Circuit reiterated in *Morris*, 283 F.3d at 505:

> [I]f all rights in a constituent work have not been transferred to the claimant, a collective work registration will not apply to the constituent work. If, on the other hand, all rights have been transferred to the claimant, then the constituent work is included in the registration of the collective work.

---

[15] The court recognized that the Copyright Office does not have authority to give opinions or define legal terms, and that its interpretation as to an issue is not entitled to controlling weight. *Id.* at 71. But, the court took "comfort" in the fact that the Copyright Office's interpretation was consistent with the court's own interpretation. *Id.*

Under the HTBCA, Topline, Inc. (and Ram Das) received from SSI exclusive use of the Subject Proprietary Assets. *See* ECF 312-7, ¶ 2.3. But, the HTBCA specifically provided that SSI was the owner of the Sandler Proprietary Assets and the Subject Proprietary Assets. *Id.* ¶ 4. Because Topline was not the owner of the copyright as to any of SSI's proprietary assets, the registration of the collective work, *Building Your Sales Factory,* did not extend to those elements. *See Morris*, 259 F.3d at 71; 17 U.S.C. § 201(c).

Accordingly, construing the facts in the Counterclaim in the light most favorable to SSI, the claim by SSI that Topline breached ¶ 4.1.2 of the HTBCA by registering the Subject Proprietary Assets with the Copyright Office fails as a matter of law. This is because Topline's registration of the collective work *Building Your Sales Factory* did not register any components of the work that were not owned by Topline. *See* ECF 312-7, ¶¶ 4, 4.1.2.

## 2. Specificity of Claims

Topline urges dismissal of Count I as to SSI's claim that Topline breached ¶ 4.2 of the HTBCA. ECF 320-1 at 20. As noted, ¶ 4.2 of the HTBCA provides, ECF 312-7 at 6:

> Ram Das, Khalsa, Topline and Kraner understand and agree that they are hereby forever relinquishing any right to independently produce or re-produce the Subject Proprietary Assets, or any variation thereon, including the Prior Workbook . . . .

In support of the Motion to Dismiss, Topline argues that, with respect to SSI's claim regarding ¶ 4.2 of the HTBCA, SSI "utterly fails to specify which particular pages of [*Building Your Sales Factory*] constitute variations of the [Subject Proprietary Assets]." ECF 320-1 at 20. According to Topline, because of this defect, "SSI offers no factual enhancement that would plausibly allow the Court to infer that either Topline or Mr. Kraner is liable for violating paragraph 4.2 of the HTBC Agreement." *Id.*

In its Opposition, SSI counters that *Building Your Sales Factory* (ECF 312-11), which Topline registered with the Copyright Office, "contains an 85-page manual entitled 'The Parature Sales Process.'" ECF 324 at 14-15.[16] According to SSI, "[t]he 'Parature Sales Process' is an obvious variation of the HTBC Materials." *Id.* at 15.

Under the pleading standards of *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662, discussed earlier, in order to state a claim a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. But, the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotations omitted).

In the Counterclaim, SSI specifically alleges that *Building Your Sales Factory* includes numerous pages of Sandler Proprietary material that were not disclosed by Topline to SSI, including: "(a) pages from the HTBC Materials; and (b) what appears to be a customized variation of the HTBC Materials for a client by the name of Parature, which was not ordered from or provided by SSI." ECF 312, ¶ 51. To be sure, SSI does not include "detailed factual allegations" or a page-by-page analysis of what portions of BYSF comprise HTBC Materials. But, SSI's allegations go beyond a simple assertion that BYSF contains "pages from the HTBC Materials." SSI has specifically identified the "Parature Sales Process" portion of BYSF as containing HTBC Materials. Notably, the "Parature Sales Process" portion of BYSF contains SSI's copyright mark on each page. *See* ECF 312-11.

In view of the foregoing, I am satisfied that SSI has stated a claim as to Count I of the Counterclaim with sufficient specificity to survive Topline's challenge on that basis.

---

[16] As discussed, ECF 312-11 contains about 450 pages and is not paginated. From my review, the "Parature Sales Process" section is in the first third of ECF 312-11.

### 3. Proximate Caution/Damages

In the Counterclaim, SSI alleges that, under the HTBCA, "Topline and Kraner agreed that SSI would be the sole and exclusive owner of the HTBC Materials [and] SSI agreed to sell the HTBC Materials to Topline and Kraner at an agreed upon price." ECF 312, ¶ 55. SSI also alleges that "Topline and Kraner materially breached the express covenants of the [HTBCA] by . . . producing variations of the HTBC Materials without purchasing same from SSI, in violation of Paragraph 4.2 of the [HTBCA]." *Id.* ¶ 57. Therefore, SSI asserts: "As a direct and proximate result of Topline's and Kraner's material breaches of the [HTBCA], SSI suffered lost profits, irreparable harm to SSI's intellectual property, and attorneys' fees." *Id.* ¶ 58.

In other words, SSI alleges that it was the sole owner of the HTBC Materials and variations of the HTBC Materials, it was the only entity entitled to produce those materials, and Topline produced variations of those materials, without authorization. *Id.* ¶¶ 55-57. Further, SSI argues it lost profits because Topline reproduced the subject proprietary assets and did not purchase those materials from SSI. *Id.* ¶ 58.

Topline urges dismissal of the breach of contract claim in Count I of the Counterclaim, asserting that it "fails to allege facts plausibly establishing the required causal connection between the alleged misconduct and the harm allegedly suffered by SSI." ECF 320-1 at 20. According to Topline, SSI's allegations are conclusory and fail to satisfy the pleading standard established by *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662. ECF 320-1 at 20.

SSI counters that the Counterclaim presents "straightforward" allegations of causation and damages for breach of contract. ECF 324 at 16. It notes that the HTBCA "expressly barred [Topline] from producing variations of the HTBC Materials except as authorized by, and purchased from, Sandler for prices set by that contract." *Id.*; *see* ECF 312-7 at 6-7.

In the Reply, Topline argues that SSI misreads the HTBCA. ECF 331 at 8. Topline asserts, *id.* (emphasis in ECF 331): "By its very text, [paragraph 4.2 of the HTBCA] does not oblige Topline or Mr. Kraner to purchase **variations** of the HTBC Materials from SSI and does not contemplate that SSI will realize any revenue from such purchases." And, Topline notes that ¶ 5 of the HTBCA provides only that Topline, Inc. and Kraner would purchase the Manual and the Audio exclusively from SSI. *Id.*; *see* ECF 312-7, ¶ 5.2.

In my view, SSI has sufficiently alleged proximate causation and damages. Although it is true that the exclusive purchase provision of ¶ 5.2 applies only to the Manual and the Audio, ¶ 4 of the HTBCA provides that Topline, Inc. and Kraner "acknowledge and agree that SSI is the sole and exclusive owner of the Sandler Proprietary Assets and any derivative works . . . including the Subject Proprietary Assets." *See* ECF 321-7. And, ¶ 4.2 of the HTBCA provides that Topline, Inc. and Kraner relinquish "any right to independently **produce or re-produce** the Subject Proprietary Assets, **or any variation thereon** . . . ." (Emphasis added).

Based on the allegations and the text of the HTBCA, SSI is the only entity with the right to reproduce or to authorize the reproduction of the Subject Proprietary Assets, and Topline allegedly reproduced those materials, without permission. The only way that Topline could have obtained the Subject Proprietary Assets, consistent with the HTBCA, was to purchase them from SSI or to otherwise purchase from SSI the right of reproduction. And, if Topline used the materials without paying for them, SSI incurred damages.

Finally, I note that the cases relied on by Topline are distinguishable. *See* ECF 320-1 at 20-21. In *Mayor & City Council of Baltimore v. Wells Fargo Bank, N.A.*, 677 F. Supp. 2d 847 (D. Md. 2010), Judge Motz dismissed a case brought by the City of Baltimore under the Fair Housing Act, in which the City alleged that Wells Fargo's lending practices led to foreclosures

that harmed the City. *Id.* at 848. In dismissing the case, Judge Motz noted that although the City had alleged that 33,000 homes had been subject to foreclosure, it had failed to allege how the foreclosures were attributable to Wells Fargo. *Id.* at 850. And, Judge Motz observed that, even based on the content of the City's submission, Wells Fargo had negligible responsibility for the harms alleged by the City. *Id.*

*Wells Fargo* is distinguishable because the allegations of causation by the City in that case were much more vague and speculative than the allegations by SSI here. In other words, the City's failure to allege what portion of foreclosures was attributable to Wells Fargo is a far cry from SSI's allegations here regarding the HTBC Materials. Moreover, unlike in *Saravia v. Select Portfolio Servicing, Inc.*, No. 1:13-CV-01921-RDB, 2014 WL 2865798, at *4 (D. Md. June 23, 2014), also cited by Topline, SSI does more than simply state the element of proximate cause "without alleging any plausible facts specific to [the] case." *Id.*

In sum, SSI has met the pleading standards of Fed. R. Civ. P. 8(a) with respect to its allegations of proximate causation and damages in Count I of the Counterclaim.

### 4. Judicial Estoppel

As to Count I of the Counterclaim, Topline contends that SSI's claims of breach of ¶¶ 4.1.2 and 4.2 of the HTBCA are barred by the doctrine of judicial estoppel. This argument is predicated on arguments advanced by SSI in 2011, regarding the definition of the term "Subject Proprietary Assets", in connection with the parties' cross motions for summary judgment. ECF 320-1 at 21-27. As an initial matter, because I have determined that SSI failed to state a claim as to Topline's breach of ¶ 4.1.2 of the HTBCA, I need only consider the judicial estoppel argument with respect to ¶ 4.2 of the HTBCA.

I pause to review the doctrine of judicial estoppel. As stated by the Fourth Circuit, "the judicial process is not some kind of game. If a litigant 'assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" *Penn. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 117 (4th Cir. 2012) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)). In other words, "[j]udicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court." *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007); *see Eagan v. Calhoun*, 347 Md. 72, 87-88, 698 A.2d 1097, 1105 (1997). The purpose of the doctrine of judicial estoppel is "to protect the integrity of the judicial process . . . ." *New Hampshire*, 532 U.S. at 749 (citation omitted).

Although courts formulate the elements of judicial estoppel in varying ways, at a minimum three conditions must be met by a party to invoke successfully the doctrine of judicial estoppel: (1) "the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation," which "must be one of fact rather than law or legal theory"; (2) "the prior inconsistent position must have been accepted by the court" in the prior litigation; and (3) "the party sought to be estopped must have 'intentionally misled the court to gain unfair advantage.'" *Lowery v. Stovall*, 92 F.3d 219, 223-24 (4th Cir. 1996) (citation omitted); *see also New Hampshire*, 532 U.S. at 750; *Dashiell v. Meeks*, 396 Md. 149, 171, 913 A.2d 10, 22 (2006). The Fourth Circuit has cautioned: "Because of the harsh results attendant with precluding a party from asserting a position that would normally be available to the party, judicial estoppel must be applied with caution." *Lowery*, 92 F.3d at 224.

A court must consider whether a party is taking a position inconsistent with a stance taken in prior litigation. *See Lowery*, 92 F.3d at 224. As indicated, in 2011 the parties submitted cross motions for summary judgment as to the counts of the Complaint pertaining to the HTBCA. *See* ECF 88 (SSI motion) ECF 89 (Topline, Inc. motion). In its motion, SSI argued, ECF 88-1 at 2 (emphasis added):

> [T]he meaning of the HTBC Agreement [is] unambiguous – *SSI agreed to limit the use and distribution of the HTBC Manual (Exhibit A to the HTBC Agreement) (a 95 page workbook)*, . . . as well as an audio recording (the "Audio") and a PowerPoint presentation ("PowerPoint Materials") which support the HTBC Manual (Exhibit A to the HTBC Agreement). However, SSI is not prohibited from reproducing, selling or otherwise using its own copyrighted materials (the Sandler Proprietary Assets) which Topline used to prepare the HTBC Manual, Audio, and PowerPoint Materials (collectively the "Subject Proprietary Assets").

Given the definition of "Subject Proprietary Assets", SSI argued that summary judgment was appropriate as to the HTBCA because "Topline has not discovered or produced any copies of the 95 page HTBC Manual (Exhibit A to the HTBC Agreement) that were distributed to anyone other than Topline or [Ram Das]." *Id.* Judge Legg denied the parties' summary judgment motions as to the HTBCA claims, finding that the language of the HTBCA was ambiguous and could not be resolved as a matter of law. ECF 106.

Topline contends that Count I of the Counterclaim is "predicated on the assumption that the term 'Subject Proprietary Assets' means not just the entire manual attached as Exhibit A to the agreement but also portions and excerpts from that manual." ECF 320-1 at 23. According to Topline, "[t]his interpretation diametrically contradicts the position that SSI took in connection with the parties' cross-motions for summary judgment in 2011." *Id.*

In its Opposition, SSI reiterates the position articulated at the hearing on November 30, 2016, *i.e.*, that it "exclusively owns all of the Sandler Proprietary Assets, among which are included the Subject Proprietary Assets such as the HTBC Manual." ECF 324 at 17. According

to SSI, "no contradiction exists between, on the one hand, the Court's rulings on the [HTBCA] and, on the other hand, the Counterclaim's allegation that [Topline] breached the [HTBCA] by filing their copyright Registration including in the registered material (1) pages from the HTBC Materials and (2) a customized variation of the HTBC Materials.[]" *Id.* at 17-18. SSI maintains that Topline's argument is flawed because it presupposes that Topline and SSI "stand in the same position regarding ownership of intellectual property and thus must be held to the same standards regarding use of that intellectual property." *Id.* at 18 n. 5.

In my view, SSI is not judicially estopped from claiming that Topline violated ¶ 4.2 of the HTBCA, because its prior position is not inconsistent with the argument that it now advances. Even assuming that SSI maintains the position that the term "Subject Proprietary Assets" refers only to the Manual in its entirety, it is not foreclosed from claiming that Topline violated ¶ 4.2 of the HTBCA.

Paragraph 2.3 of the HTBCA is relevant to exclusivity as to Topline, Inc. and Ram Das. It provides, ECF 312-7 at 4, ¶ 2.3: "During the term of this Agreement, SSI shall sell or otherwise provide the Subject Proprietary Assets only to Ram Das or Topline." But, ¶ 4.2 of the HTBCA provides, ECF 312-7 at 6, ¶ 4.2 (emphasis added): "Ram Das, Khalsa, Topline[, Inc.] and Kraner understand and agree that they are hereby forever relinquishing any right to independently produce or re-produce the Subject Proprietary Assets, *or any variation thereon*."[17] Thus, the scope of ¶ 4.2 is broader than the scope of ¶ 2.3, because ¶ 4.2 covers both the Subject Proprietary Assets **and** any variation thereon.

---

[17] Although the term *variation* is not defined in the HTBCA, under principles of contract construction it maintains its common meaning. *DIRECTV, Inc.*, *supra*, 376 Md. at 313, 829 A.2d at 632–33; *see also* OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press, "Variation" ("The fact of varying in condition, character, degree, or other quality; the fact of

This distinction makes it tenable for SSI to assert both positions without contradicting itself. This is because even if *Building Your Sales Factory* does not constitute a reproduction of the Subject Proprietary Assets (*i.e.*, in SSI's view, an exact copy of the Manual), *Building Your Sales Factory* could nevertheless contain *variations* of the Subject Proprietary Assets. *See* ECF 312-7 at 6, ¶ 4.2. SSI makes this exact allegation in its Counterclaim. It asserts, ECF 312, ¶ 57: "Topline[, Inc.] and Kraner materially breached the express covenants of the [HTBCA] by . . . producing variations of the HTBC Materials without purchasing same from SSI, in violation of Paragraph 4.2 of the [HTBCA]."

In sum, viewing the allegations in the Counterclaim and the text of the HTBCA in the light most favorable to SSI, SSI's claim for breach of ¶ 4.2 of the HTBCA does not contradict its previous position with respect to the definition of the HTBCA. Accordingly, the doctrine of judicial estoppel does not bar Count I of the Counterclaim.

### D. Failure to State a Claim – Count II

In Count II of the Counterclaim, SSI alleges that Topline, Inc. "materially breached" ¶ 5.1 of the Franchise Agreements by "producing its own written material" (*i.e.*, *Building Your Sales Factory*), without prior written permission from SSI, because it "contains SSI's Proprietary Assets . . . ." ECF 312, ¶ 62; *see id.* ¶¶ 59-63.

Topline argues that Count II is subject to dismissal under Rule 12(b)(6) for failure to state a claim, *inter alia*, on the ground that the registration of *Building Your Sales Factory*, "on its faces, fails to establish the plausibility that Topline violated paragraph 5.1(b) of the Franchise Agreement." ECF 320-1 at 27. It asserts: "Contrary to the implication of paragraph 62 of SSI's [Counterclaim], paragraph 5.1(b) does not prohibit all production of a franchisee's own written

undergoing modification or alteration, especially within certain limits.") (*last accessed* March 9, 2017).

material." *Id.* Rather, Topline maintains that ¶ 5.1(b) only prohibits a franchisee from "producing its own written materials or audio . . . ***for sale, publication or distribution*** . . . ***containing any of the Proprietary Assets or Sandler System***." *Id.* at 28 (emphasis in ECF 320-1). Topline insists that it is "implausible that Topline[, Inc.] would sell, publish, or distribute" *Building Your Sales Factory* in the form that it was submitted to the Copyright Office, in view of the "handwritten annotations, additions, and revisions to the pages . . . ." *Id.*

SSI offers two counterarguments. ECF 324 at 19-20. First, SSI points out that ¶ 5.1(b) is not limited to the prohibition of the sale, publication, or distribution of materials containing Sandler Proprietary Assets. *Id.* at 19. SSI notes that ¶ 5.1(b) also prohibits the "use" of the Sandler System in an unauthorized way, and an unauthorized use constitutes an infringement. *Id.* Second, SSI argues that Topline, Inc. published or distributed Sandler Proprietary Assets by depositing a copy with the Copyright Office and by distributing a Sandler Proprietary Asset to Parature. *Id.* at 20.

In its Reply, Topline argues that the "use" provision of ¶ 5.1(b) is not relevant because in the Counterclaim SSI did not allege a breach of that provision. ECF 331 at 12. Moreover, Topline claims that filing a document with the Copyright Office does not constitute "publication" under the Act. *Id.* Finally, Topline contends that SSI's argument regarding Parature is unfounded, because no such allegation is made in the Counterclaim. *Id.* at 13.

The arguments of the parties largely revolve around the language of the Franchise Agreements and the Counterclaim. For convenience, I shall again review Paragraph 5.1(b) of the 2010 and 2015 Franchise Agreements. It provides, in relevant part, ECF 312-5 at 11-12; 312-6 at 12-13 (emphasis added):

> Franchisee shall use the Sandler System and the Proprietary Assets strictly
> in accordance with the terms of this Agreement and all policies set forth from

time to time in the Operations Manual. Any unauthorized use of the Sandler System and/or the Proprietary Assets is and shall be deemed to be an infringement of SSI's rights. *Franchisee agrees that producing, or permitting to be produced, its own written materials . . . for sale, publication or distribution . . . containing any of the Proprietary Assets or Sandler System is not authorized and shall be deemed an infringement of SSI' s rights unless the Franchisee obtains SSI' s prior written approval . . . .*

In my view, and as explained below, SSI has failed to allege a plausible violation of the third sentence of ¶ 5.1(b) of the Franchise Agreement ("Franchisee agrees that producing . . . .), which is the only provision of ¶ 5.1(b) specifically referred to in the Counterclaim. Viewing the facts in the light most favorable to SSI as counter-plaintiff, mere registration of a work with the Copyright Office does not constitute either publication or distribution of that work. SSI does not allege in the Counterclaim a breach of the "use" provision of ¶ 5.1(b) or improper distribution of Subject Proprietary Assets to Parature.

The Copyright Act defines publication, in relevant part, as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. . . . A public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101. And, publication is commonly defined as: "The issuing of a book, newspaper, magazine, or other printed matter for public sale or distribution . . . ." *See DIRECTV, Inc.*, *supra*, 376 Md. at 313, 829 A.2d at 632–33; *see also* OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press, "Publication" (*last accessed* March 9, 2017). Under either definition of publication, it is not plausible that the mere registration of a work with the Copyright Office constitutes a publication of that work.

The Copyright Act does not define "distribution." However, in the OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press (*last accessed* March 9, 2017) "distribution" is defined as: "The action of dividing and dealing out or bestowing in portions among a number of

recipients; apportionment, allotment." It does not seem plausible that registering *Building Your Sales Factory* with the Copyright Office constitutes distribution of that publication.

Moreover, if SSI did not intend to limit its claim of a breach of ¶ 5.1(b) of the Franchise Agreements to the publication or distribution of BYSF, SSI has failed to put Topline, Inc. on notice of the claims against it. As indicated, one of the purposes of Fed. R. Civ. P. 8 is to ensure that defendants are "given adequate notice of the nature of a claim" made against them. *Twombly*, 550 U.S. at 555–56 (2007). However, SSI did not allege some other "unauthorized use" under ¶ 5.1(b).

To the extent that SSI claims in its Opposition that Topline, Inc. published or distributed Sandler Proprietary Assets to Parature, that allegation was not made in the Counterclaim. Therefore, it cannot be considered. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Laboratories Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

In sum, viewing SSI's allegations as true, and resolving all inferences in favor of SSI, SSI has failed to state a claim that Topline, Inc. breached ¶ 5.1(b) of the Franchise Agreements. In particular, SSI has failed to state a claim that Topline, Inc. produced for publication or distribution materials containing Sandler Proprietary Assets. Moreover, SSI has failed to state with sufficient specificity a claim that Topline, Inc. engaged in some other "unauthorized use of the Sandler System and/or the Proprietary Assets." Therefore, I shall grant Topline's Motion to Dismiss Count II of the Counterclaim, without prejudice, and with leave to amend.

### E. Failure to State a Claim – Count III

In Count III of the Counterclaim, SSI asserts a claim against Topline for copyright infringement, based on Topline's production and registration of *Building Your Sales Factory*.

ECF 312 ¶¶ 64-71. Topline urges dismissal of Count III, claiming that SSI has failed adequately to allege which parts of BYSF infringe on SSI's copyright; SSI has not plausibly alleged that Topline actually published SSI's copyrighted material; and, to the extent that Topline copied any of SSI's protected material, such copying was *de minimis*. ECF 320-1 at 29-32.

As indicated, under the Copyright Act, anyone who violates a copyright owner's exclusive rights "is an infringer of the copyright or right of the author . . . ." 17 U.S.C. § 501. Section 106 of Title 17 of the U.S. Code grants to the owner of a copyright, *inter alia*, the following "[e]xclusive rights in copyrighted works":

> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . . .

Notably, "[o]ne who makes infringing copies or phonorecords of a work infringes the copyright owner's reproduction right under Section 106(1), even if he does not also infringe the Section 106(3) distribution right by sale or other disposition of those copies or phonorecords." 2 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 8.02(C) ("Nimmer"); *accord Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 787 n. 54 (5th Cir. 1999). And, of relevance here, 17 U.S.C. § 501(b) states that the "legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).

According to Topline, SSI's claim that Topline "published" *Building Your Sales Factory* does not satisfy the pleading requirements of *Iqbal* and *Twombly*. *See* ECF 312, ¶ 68. As indicated, to state a claim for copyright infringement, plaintiff must allege that defendant

interfered with plaintiff's exclusive rights to the copyright. *See* 17 U.S.C. § 501; *CoStar*, 373 F.3d at 549. Stated differently, to establish copyright infringement "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Feist Publications., Inc.*, 499 U.S. at 361.

SSI has presented allegations sufficient to give rise to an inference that Topline produced copyrighted work, and/or prepared derivative works based upon the copyrighted work, without permission. *See, e.g.*, ECF 312, ¶ 69 ("By virtue of having written and published *Building Your Sales Factory* as reflected in the application and registration, Kraner and Topline, Inc. have infringed Sandler's exclusive copyrights in its Copyright Works by reproducing a substantially similar, if not identical work . . . .").

With respect to the first *Feist* prong, SSI has alleged that it is the owner of a copyright. In particular, SSI has alleged that it is the owner of the Sandler Proprietary Assets (ECF 312 ¶ 53) and has attached as an exhibit to the Counterclaim certificates of registration for various works. *See* ECF 312-12. The registered works are for "President's Club Professional Development Program – Student's Materials"; "President's Club, Professional Development Program – Trainee Edition"; and "The President's Club Workbook." *See* ECF 312-12. Topline does not dispute in the Motion to Dismiss that SSI registered various copyrights for the Sandler Proprietary Assets and Subject Proprietary Assets and that SSI is entitled to enforce those copyrights. *See* ECF 320-1 at 29-32.

Moreover, the Counterclaim sufficiently alleges the elements of the second *Feist* prong. As to access, there can be little dispute that Topline had access to SSI's copyrighted materials by virtue of Topline, Inc.'s position as SSI's franchisee. *See* ECF 312. And, as to copying, the Counterclaim alleges that Topline copied components of the Subject Proprietary Assets and

Sandler Proprietary Assets in *Building Your Sales Factory*, including "pages from the HTBC Materials" and "what appears to be a customized variation of the HTBC Materials for a client by the name of Parature . . . ." ECF 312, ¶¶ 51, 66. Although SSI has not made precise allegations as to the specific elements of *Building Your Sales Factory* that were allegedly copied by Topline from HTBC Materials, SSI's allegations go beyond bald accusations and conclusory statements and satisfy *Twombly*'s requirements of giving counter-defendants fair notice of the claims against them. 550 U.S. at 555-56.

Notably, it is apparent from the face of the document that *Building Your Sales Factory* contains copyrighted SSI material (*e.g.*, the "Parature Sales Process"). *See* ECF 312-11. Moreover, various courts have rejected the notion that claims for copyright demand a higher pleading standard than the standard of pleading for other claims. *See, e.g.*, *Coach, Inc. v. Farmers Mkt. & Auction*, 881 F. Supp. 2d 695, 707 (D. Md. 2012); *see also* Nimmer § 12.09(a)(2) ("Though it is clearly desirable to allege the infringing acts with some specificity,[] the modern view disclaims any heightened pleading standard in the copyright ambit.[]").

At this juncture, I decline to consider Topline's argument that any reproduction was *de minimis*. The argument appears to amount to an affirmative defense, which cannot be resolved on the face of the Counterclaim. *See Goodman*, 494 F.3d at 464.

In sum, I shall deny Topline's Motion to Dismiss with respect to SSI's claim for copyright infringement. SSI has advanced allegations sufficient to state a claim for a violation of the Copyright Act.

### F. Failure to State a Claim – Count IV

Count IV of the Counterclaim asserts a claim for common law fraud arising out of two alleged misrepresentations. ECF 312, ¶¶ 72-80. First, SSI alleges that counsel for Topline fraudulently misrepresented in an email that "the manual, The Reluctant Salesman, was the same item that Topline[, Inc.] and Kraner registered with the Copyright Office as the program *Building Your Sales Factory*." *Id.* ¶ 73. Second, SSI alleges that, in negotiations for the renewal of the 2010 Franchise Agreement, Topline, Inc. and Kraner fraudulently failed to disclose that Topline had registered BYSF with the Copyright Office. *Id.* ¶ 74.

As a preliminary matter, claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened pleading standard under Fed. R. Civ. P. 9(b). *See, e.g., E–Shops Corp. v. U.S. Bank N.A.,* 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.,* 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland Consumer Protection Act claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." A plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs

to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew,* 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Regardless of the particular theory, at trial the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor,* 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

## 1. Intentional Misrepresentation

As indicated, SSI claims that, through counsel, Topline, Inc. and Kraner falsely represented to SSI that *The Reluctant Salesman* was the "same item" registered with the Copyright Office as *Building Your Sales Factory.* ECF 312, ¶ 73. In particular, according to SSI, on or about May 26, 2016, SSI, through counsel, sent Topline, Inc. a Notice of Default and requested that Topline, Inc. submit a copy of *Building Your Sales Factory* to SSI. *Id.* ¶ 47. Then, on or about July 14, 2016, counsel for Topline, Inc. provided SSI with a copy of a 98-page document titled *The Reluctant Salesman, By Steven Kraner*, 2 April 2011. ECF 312, ¶ 48; *see* ECF 312-10 (*The Reluctant Salesman*).

As noted, SSI asserts that Topline's counsel "purported [*The Reluctant* Salesman] to be the copyrighted publication entitled *Building Your Sales Factory*." ECF 312, ¶ 48. But, *The Reluctant Salesman* is not the same publication that Topline registered with the Copyright Office. Rather, Topline registered *Building Your Sales Factory. Id.* ¶ 73.

In the Motion to Dismiss, Topline challenges SSI's claim, contending that SSI failed to assert that Topline made any false representation and, in any event, SSI did not rely to its detriment on any statements made by Topline. ECF 320-1 at 32-36. As indicated, Topline

appended as an exhibit to its Motion to Dismiss the e-mail chain underlying SSI's claim of fraudulent misrepresentation. *See* ECF 320-2.

In its Opposition, SSI contends that *counsel* misled SSI in the summer of 2016 with respect to the content of the registered materials, by sending *The Reluctant Salesman* to SSI, when SSI requested a copy of another work. ECF 324 at 24.[18] According to SSI, it is clear from the correspondence that SSI requested a copy of *Building Your Sales Factory*, which was registered with the Copyright Office. *Id.*

Fraudulent misrepresentation is the garden variety of fraud and is often described simply as "fraud." In an action for fraudulent misrepresentation, the plaintiff ordinarily must show:

(1) that the defendant made a false representation to the plaintiff;

(2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;

(3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

(4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and

(5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

---

[18] The actions of a lawyer may bind the client. *See generally Pioneer Inv. Services Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 381 (1993) ("Clients may be held accountable for their attorney's acts and omissions."). But, SSI does not explain why, in a *fraud* claim, allegations as to fraudulent conduct of counsel are attributable to the client in the absence of the client's knowledge. Nor does SSI allege that Topline had such knowledge or that Topline's counsel acted at the direction of the client. In any event, although Topline claims counsel did not represent Kraner at the relevant times, it has not raised this contention as to Topline, Inc.

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n. 18, 48 A.3d 276, 282 n. 18 (2012); *Sass,* 152 Md. App. at 429, 832 A.2d at 260; MARYLAND CIVIL PATTERN JURY INSTRUCTIONS, 11:1 FRAUD OR DECEIT.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex, Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993). "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'" *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)), and the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

Section 541 of The Restatement (Second) of Torts (Am. L. Inst. 1965) ("Restatement") provides guidance. It states, *id.*: "The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him." This approach has been followed by courts around the country. *See, e.g.*, *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) (applying New York law); *Lewis v. Cohen*, 603 A.2d 352, 354 (Vt. 1991); *Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 638 (Utah Ct. App. 1987); *Foust v. Valleybrook Realty Co.*, 446 N.E.2d 1122, 1125 (Ohio Ct. App. 6th Dist. 1981). Moreover, the Maryland Court of Appeals has relied on the Restatement in the context of fraudulent misrepresentation. *See, e.g.*, *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 336, 71 A.3d 30, 49 (citing the Restatement (Second) as persuasive authority on fraudulent

misrepresentation), *on reconsideration*, 433 Md. 502, 71 A.3d 150 (2013); *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 740-41, 929 A.2d 932, 945-46 (2007) (adopting Restatement approach for aspects of fraudulent misrepresentation).

In my view, SSI's claim for fraud, based on its allegation that counsel for Topline misrepresented what publication was filed with the Copyright Office, fails as a matter of law. In particular, SSI cannot maintain a claim for fraudulent misrepresentation because SSI did not allege that it actually relied on the misrepresentation. *See* ECF 312, ¶ 77.

SSI asserts: "Upon receipt of *The Reluctant Salesman*, and noticing a discrepancy between the titles of the materials registered by Topline with the Copyright Office . . . , SSI requested a certified copy from the Copyright Office of the program registered by Topline as *Building Your Sales Factory* . . . ." *Id.* ¶ 49. Clearly, SSI conducted further investigation soon after receipt of the alleged misrepresentation. This makes it clear that SSI did not rely on the alleged misrepresentation. Applying the approach of the Restatement, SSI would be unable to recover because SSI has affirmatively stated that the supposed falsity of the representation of *The Reluctant Salesman* was promptly known to it. *See* ECF 312, ¶ 49. Therefore, SSI cannot establish detrimental reliance.

In light of the foregoing, I shall dismiss SSI's claim for fraudulent misrepresentation. At this late stage in the litigation, I shall not grant leave to amend, because this claim borders on specious and is little more than an obvious attempt at "piling on."

## 2.  Fraudulent Concealment

In its Counterclaim, SSI asserts: "Topline and Kraner falsely represented to SSI, through omission, that it had registered Building Your Sales Factory, which contains SSI's Proprietary Assets, with the Copyright Office." ECF 312, ¶ 74. According to SSI, Topline made this

omission with the "intent to deceive SSI into thinking that Topline and Kraner had not defaulted under the [HTBCA] or the Franchise Agreement, so that SSI would renew Topline's Franchise Agreement." *Id.* ¶ 76.

In its Motion to Dismiss, Topline asserts that the claim for fraudulent concealment should be dismissed because "SSI identifies no legal duty by Topline or Mr. Kraner to disclose the copyright submission to SSI, and there is none." ECF 320-1 at 34. In support of this argument, Topline notes that both the HTBCA and the Franchise Agreements make clear that no special relationship exists between the entities. *Id.* at 34-35; *see, e.g.*, ECF 312-7 at 12 ¶ 11.3 (HTBCA); ECF 312-5 at 16-17 ¶ 8.2 (2010 Franchise Agreement).

In its Opposition, SSI counters that the Franchise Agreement gave rise to a duty to disclose. ECF 324 at 24-25. SSI contends, ECF 324 at 25: "Given Topline's repeated acknowledgment in that provision that existing defaults bar potential renewal of the Franchise Agreement, Topline's anticipated 2015 renewal put Topline (and its sole principal, Kraner) under a duty to disclose." In particular, SSI points to ¶ 2.2(b) of the Franchise Agreement, ECF 312-5 at 6, ¶ 2.2(b), which states:

> Franchisee is not, at the time of renewal, in default of any provisions of this Agreement or any other agreement between Franchisee and SSI, and, in SSI's sole and unrestricted discretion has substantially complied with the terms and conditions of all such agreements during the Initial Term, or during each Renewal Term, as the case may be . . . .
>
> In Maryland, the essential elements of a claim for fraudulent concealment are:
>
> (1) the defendant owed a duty to the plaintiff to disclose a material fact;
>
> (2) the defendant failed to disclose that fact;
>
> (3) the defendant intended to defraud or deceive the plaintiff;
>
> (4) the plaintiff took action in justifiable reliance on the concealment; and

(5) the plaintiff suffered damages as a result of the defendant's concealment.

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010); *Lloyd v. General Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007); *Green v. H & R Block, Inc.*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999). The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road*, *supra*, 360 Md. at 100 n. 14, 756 A.2d at 976 n. 14 (2000) (internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

Maryland courts have determined that a duty to disclose "arises in certain relationships such as a confidential or fiduciary relationship." *Hogan v. Maryland State Dental Ass'n*, 155 Md. App. 556, 566, 843 A.2d 902, 908 (2004); *see also Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 323-24, 389 A.2d 887 (1978) (finding a duty to disclose based on a fiduciary relationship); *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867 (1984) (finding a duty to disclose based on a confidential relationship). And, in *Lubore v. RPM Assocs., Inc.*, 109 Md. App. 312, 674 A.2d 547 (1996), the Maryland Court of Special Appeals said: "One who conceals facts that materially qualify affirmative representations may be liable for fraud." *Id.* at 330; 674 A.2d at 556.

In my view, SSI has failed to allege facts that show that Topline owed SSI a duty to disclose any breaches of the Franchise Agreements or the HTBCA. Initially, it is evident from

the text of the various agreements that no confidential or fiduciary relationship existed between

SSI and Topline.  The HTBCA provides, ECF 312-7 at 12 ¶ 11.3:

> Nothing contained in this Agreement shall be deemed or construed as creating the relationship of principal or agent between SSI and  . . . Topline or Kraner.  It is understood by the parties that the relationship between SSI and . . . Topline and Kraner shall at all times be that of independent contractors and SSI is not the agent, employee, partner or joint venturer of . . . Topline or Kraner, and . . . Topline or Kraner is not the agent, employee, partner or joint venturer of SSI.

Likewise, the 2010 Franchise Agreement, which would have governed Topline's 2015 renewal, contained similar language.  It states, in pertinent part, ECF 312-5 at 16-17 ¶ 8.2 (emphasis added):

> It is understood and agreed by the parties that **this Agreement does not create a fiduciary relationship between them** and that Franchisee shall be an independent contractor with the entire control and direction of its Franchise, subject only to the terms and conditions of this Agreement.  **No agency, employment or partnership is created or implied by the terms of this Agreement**.

SSI has not made any other allegations in the Counterclaim that would give rise to the

inference that a special relationship existed between SSI and Topline.  *See* ECF 312.  Therefore,

SSI has failed to allege facts that would plausibly support the conclusion that a special

relationship existed between SSI and Topline, such that Topline had a duty to disclose breaches

of the HTBCA and/or Franchise Agreements.

SSI's citation to *Lubore*, *supra*, 109 Md. 312, 647 A.2d 547, does not alter this

conclusion.  In that case, the Maryland Court of Special Appeals recognized that a duty to

disclose exists where a party "conceals facts that materially qualify affirmative

representations . . . ."  *Id.* at 330, 674 A.2d at 556.

In *Lubore*, the court determined that an employee stated a claim for fraudulent

concealment against an employer when, after the employee began work, the employer included

terms in the employment contract that were never discussed during negotiations between the employer and employee. *Id.* at 331, 647 A.2d at 556. The court said that "it is reasonable to infer from the allegations that appellees presented appellant with a partial or fragmentary representation, which was rendered misleading by virtue of the importance of the missing or omitted facts. Consequently, appellees owed a duty of disclosure." *Id.* The *Lubore* Court also observed, in the context of the tort of *negligent* misrepresentation, that a duty of care "may arise out of a 'special relationship or intimate nexus'" in an arms-length commercial transaction. *Lubore*, 109 Md. App. at 336, 647 A.2d at 559 (quoting *Weisman v. Connors*, 312 Md. 428, 448, 540 A.2d 783, 789 (1988)).

Here, SSI has not alleged that Topline made a partial disclosure that concealed facts that materially qualified any affirmative representations. *See* ECF 312. Thus, the reasoning of *Lubore* is inapplicable.

Because SSI has failed to allege facts showing that Topline owed SSI a duty to disclose breaches of the HTBCA and/or the Franchise Agreements, I shall grant Topline's Motion to Dismiss SSI's claim for fraudulent concealment. And, given the text of the pertinent agreements, coupled with the impending trial date and the age of this case, I decline to grant leave to amend.

### G. Personal Liability of Steven Kraner

Counts I, III, and IV of the Counterclaim are asserted against Topline, Inc. as a counter-defendant and Kraner as a third-party defendant. Topline urges dismissal of the third-party claim against Kraner on the ground that Kraner cannot be held personally liable for the actions of Topline. ECF 320-1 at 13-14. According to Topline, SSI has failed to allege facts plausibly establishing that Kraner engaged in any wrongdoing that would give rise to personal liability. *Id.*

at 13. Moreover, Topline asserts that dismissal as to Kraner is necessary because Kraner was improperly joined in the litigation as a third-party defendant. *Id.* at 14.

For the reasons stated below, I conclude that SSI improperly joined Kraner as a third-party defendant. Therefore, I shall dismiss the claims against Kraner, without prejudice and with leave to amend.

Topline argues that "none of SSI's claims against Mr. Kraner is properly brought as a third-party claim because SSI makes no allegations that Mr. Kraner's alleged liability is derived from or secondary to SSI's liability to Topline." *Id.* at 14 n. 3 (citing Fed. R. Civ. P. 14(a)(1)). In its Opposition, SSI argues that Topline's "Rule 14 argument is a hyper-technical 'bridge to nowhere.'" ECF 324 at 14 n.3. According to SSI, this issue is "subject to a simple correction by recognizing Kraner as a counterclaim defendant under Rule 13." *Id.* SSI adds that because Kraner is already active and represented in the litigation, "his formal joinder as a party would be unnecessary . . . ." *Id.*

Topline's argument is, at the very least, a bridge to the scenic route. The claims against Kraner are subject to dismissal because, under Rule 14, Kraner was improperly sued as a third-party defendant.

Fed. R. Civ. P. 14(a)(1) provides, in pertinent part: "A defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." A third-party claim under Rule 14(a) contemplates that third-party liability "'is in some way dependent on the outcome of the main claim.'" *Chelsea House North Apartments, LLC v. Blonder*, 223 F.R.D. 388, 390 (D. Md. 2004) (citation omitted). Notably, "[t]he objective of Rule 14 is to avoid the situation that arises when a defendant has been held liable to plaintiff and then finds it necessary to bring a separate action against a third

individual who may be liable to defendant for all or part of plaintiff's original claim." Wright & Miller § 1442.

Here, SSI does not claim that Kraner is liable to SSI if SSI is liable to Topline, Inc. *See* ECF 312. Therefore, SSI improperly sued Kraner as a third-party defendant.

Despite the purely technical nature of the defect, I am not aware of any authority that would permit the Court to overlook it or to convert Kraner's status in the litigation to that of counter-defendant under Rule 13, rather than a third-party defendant under Rule 14. *See Blonder*, 223 F.R.D. at 390-92 (dismissing a third-party complaint with leave to amend where the third-party complaint should have been brought as a counterclaim). Accordingly, I shall dismiss the third-party claim against Kraner, with leave to amend.[19]

## V.    Motion to Strike

In its Motion to Strike, Topline asks the Court to strike several of the affirmative defenses asserted by SSI in its Second Amended Answer (ECF 298). ECF 321. In particular, Topline asks the Court to strike the second sentence of the Third Affirmative Defense; the Sixth Affirmative Defense; and the Seventh Affirmative Defense. *Id.* According to Topline, these affirmative defenses should be stricken because they fail to meet the pleading standards articulated by *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544.

### A.  Standard of Review

Under Fed. R. Civ. P. 12(f), a "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Nevertheless, "Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt.*

---

[19] Amendment should not delay the progress of this case because SSI need only repackage its claims as to Kraner.

*Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal citations and quotations omitted).

"When reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'" *Piontek v. Serv. Ctrs. Corp.*, PJM-10-01202, 2010 WL 4449419, at *3 (D. Md. Nov. 5, 2010) (citation omitted). And, the facts set forth in a defendant's answer must be taken as true. *Kelly v. Kosuga*, 358 U.S. 516, 516 (1959) ("A motion was made to strike this defense and therefore the facts underlying it must be taken to be those set up in the petitioner's answer."); *see also*, *e.g.*, 5C Wright & Miller, Federal Practice & Procedure § 1380, 406 (3d ed. 2004 & Supp. 2014) ("Wright & Miller").

Generally, courts are not inclined to employ the "drastic remedy," *Waste Mgmt. Holdings*, 252 F.3d at 347, of striking defenses unless the movant can "demonstrate that [it] will be prejudiced if the defense is not stricken." *Miller v. Live Nation Worldwide, Inc.*, TDC-14-02697, 2015 WL 235553, at *3 (D. Md. Jan. 15, 2015); *see also Haley Paint Co. v. E.I. Du Pont De Nemours & Co.*, 279 F.R.D. 331, 337 (D. Md. 2012); *Certain Underwriters at Lloyd's, London v. R.J. Wilson & Associates, Ltd.*, CCB-11-01809, 2012 WL 2945489, at *5 (D. Md. July 17, 2012) ("[T]he court is disinclined to use its discretion to strike or limit defendants' affirmative defenses in the absence of clear and undue prejudice."). A movant can demonstrate prejudice by showing that, for example, inclusion of the defense will affect the scope of discovery. *See*, *e.g.*, *Villa v. Ally Fin., Inc.*, 1:13CV953, 2014 WL 800450, at *1 (M.D.N.C. Feb. 28, 2014) ("[T]he moving party must show prejudice: for instance, where an irrelevant affirmative defense results in increased time and expense of trial, including the possibility of extensive and burdensome discovery.") (citations and alterations in original omitted) (alteration added by this Court); *E.E.O.C. v. Spoa, LLC*, CCB-13-01615, 2014 WL 47337, at *3 (D. Md.

Jan. 3, 2014) ("[T]he EEOC cannot claim prejudice when it has been given early notice of the affirmative defenses and when the defenses will not in any significant way affect the scope of discovery.").

To date, neither the Supreme Court nor the Fourth Circuit has indicated whether the heightened pleading standard of *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662, applies to affirmative defenses. *Cf. Walters v. Performant Recovery, Inc.*, 14-CV-01977 (VLB), 2015 WL 4999796, at *1 (D. Conn. Aug. 21, 2015) ("[T]here is much disagreement among courts … regarding the standards under which … motions [to strike] are to be resolved.").

To be sure, several judges in this District have determined that *Twombly* and *Iqbal* are applicable to the pleading of affirmative defenses. *See*, *e.g.*, *Alston v. Equifax Information Services, LLC*, GLR-13-00934, 2014 WL 580148, at *2 (D. Md. Feb. 11, 2014) (Russell, J.); *Blind Indus. and Servs. of Md. v. Route 40 Paintball Park*, WMN-11-03562, 2012 WL 2946688, at *3 (D. Md. July 17, 2012) (Gallagher, M.J.); *Aguilar v. City Lights of China Restaurant, Inc.*, DKC-11-02416, 2011 WL 5118325, at *1-4 (D. Md. Oct. 24, 2011) (Chasanow, J.); *Bradshaw v. Hilco Receivables, LLC,* 725 F. Supp. 2d 532, 536-37 (D. Md. 2010) (Bennett, J.); *Topline Solutions, Inc. v. Sandler Sys., Inc.*, L-09-03102, 2010 WL 2998836, at *1 (D. Md. July 27, 2010) (Legg, J.). On the other hand, other judges in this District have concluded that *Twombly* and *Iqbal* are not clearly applicable in considering a motion to strike, based on differences in the language of Fed. R. Civ. P. 8(a), which applies to claims for relief, and Rule 8 (b) and (c), which apply to defenses and affirmative defenses, respectively. *See*, *e.g.*, *LBCMT 2007-C3 Urbana Pike, LLC v. Sheppard*, 302 F.R.D. 385, 387 (D. Md. 2014) (Bredar, J.) (declining to apply *Twombly* and *Iqbal* standard); *Lockheed Martin Corp. v. United States*, 973 F. Supp. 2d 591, 593

(D. Md. 2013) (Williams, J.); *Gardner v. Montgomery Cnty. Teachers Fed. Credit Union*, JFM-10-02781 (D. Md. Jan. 7, 2011) (ECF No. 11).

There are differences in the language of Rule 8(a), Rule 8(b), and Rule 8(c), arguably suggesting that the plausibility standard is inapplicable to affirmative defenses. For example, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," while Rule 8(b)(1)(A) merely requires a party to "state in short and plain terms its defenses to each claim." Nor does Rule 8(c) mention a factual showing. Nevertheless, what the court said in *Palmer v. Oakland Farms, Inc.*, 5:10CV00029, 2010 WL 2605179, at *4 (W.D. Va. June 24, 2010), resonates here:

> On its face, the argument accepted by the majority of courts extending the "plausibility" pleading standard of *Twombly* and *Iqbal* to defensive pleadings is compelling. As the plaintiff argues, it neither makes sense nor is it fair to require a plaintiff to provide the defendant with enough notice that there is a plausible, factual basis for her claim under one pleading standard and then permit the defendant under another pleading standard simply to suggest that some defense may possibly apply in the case.

Indeed, "it would be incongruous and unfair to require a plaintiff to operate under one standard and to permit the defendant to operate under a different, less stringent standard." *Topline Solutions, Inc.*, 2010 WL 2998836, at *1. Moreover, "[b]oilerplate defenses clutter the docket and, further, create unnecessary work. . . . Rule 15 allows for appropriate amendments and counsel should therefore feel no need . . . to window-dress pleadings early for fear of losing defenses later." *Safeco Ins. Co. of Am. v. O'Hara Corp.*, 08-CV-10545, 2008 WL 2558015, at *1 (E.D. Mich. June 25, 2008).

In any event, the heightened pleading standard does not require the assertion of all supporting evidentiary facts. *See Palmer*, 2010 WL 2605179, at *5. "At a minimum, however, some statement of the ultimate facts underlying the defense must be set forth, and both its non-

conclusory factual content and the reasonable inferences from that content, must plausibly suggest a cognizable defense available to the defendant." *Id.*

## B. Discussion

Topline generally incorporates and relies on its arguments with respect to the corresponding portions of the Motion to Dismiss. ECF 321 at 4-5. Similarly, SSI incorporates and relies upon its corresponding arguments in its Opposition to the Motion to Dismiss. ECF 324 at 26. Therefore, with the exception of the discussion of the Seventh Affirmative Defense, for which Topline makes an argument independent of the Motion to Dismiss, I shall reach the same outcomes on the Motion to Strike as I reached with regard to the Motion to Dismiss.

The second sentence of SSI's Third Affirmative Defense states, ECF 298 at 8, ¶ 3:

> Topline is estopped from asserting its claims in Counts II and V of the Complaint because Plaintiff breached the Agreement and Mutual Release, referred to by Plaintiff as the HTBC Agreement, by improperly seeking copyright protection of SSI's Proprietary Materials and by improperly producing a variation of the HTBC Materials without purchasing same from SSI.

I shall deny Topline's Motion to Strike the second sentence of the Third Affirmative Defense for the reasons stated earlier in my discussion as to the Motion to Dismiss Count I of the Counterclaim. As noted, I determined that SSI failed to state a claim for a violation of ¶ 4.1.2 of the HTBCA because Topline did not register as a collective work any of the Subject Proprietary Assets with the Copyright Office by virtue of its registration of *Building Your Sales Factory*. But, I found that SSI had set forth allegations sufficient to state a claim that Topline breached ¶ 4.2 of the HTBCA.

Because the parties have not advanced any arguments independent of those advanced as to Count I of the Counterclaim (*see* ECF 321 at 4; ECF 324 at 26), I shall deny the Motion to Strike the second sentence of the Third Affirmative Defense.

SSI's Sixth Affirmative Defense provides, ECF 298 at 8, ¶ 6:

> The Complaint is barred in whole or in part by *fraud, in pari delicto,* and *unclean hands*. Topline has deliberately and fraudulently with the intention to injure SSI, concealed its deliberate and intentional breach of the HTBC Agreement when it improperly sought copyright protection of SSI's Proprietary Assets and improperly produced SSI's Proprietary Assets to third parties without purchasing the same from SSI.

I shall deny Topline's Motion to Strike SSI's Sixth Affirmative Defense. As indicated, I previously determined that SSI asserted allegations sufficient to enable it to pursue its claim for copyright infringement based on Topline's alleged interference with SSI's exclusive copyright rights. *See, supra,* Part IV.A.5. However, I also determined that SSI had failed to state a claim against SSI for fraud. It appears from the text of the defense and the parties' briefing that the viability of either Count III or Count IV of the Counterclaim would be sufficient for SSI to maintain its Sixth Affirmative Defense. *See* ECF 321 at 4; ECF 324 at 26. Accordingly, in light of my decision with respect to the Motion to Dismiss Count III of the Counterclaim, I shall deny the Motion to Strike SSI's Sixth Affirmative Defense.

Finally, SSI's Seventh Affirmative Defense states, ECF 298 at 9, ¶ 7 (emphasis in ECF 298): "The Complaint is barred in whole or in part by *failure of consideration*. Topline has breached the HTBC Agreement by producing SSI's Proprietary Assets to third parties without purchasing the same from SSI."

In their filings, the parties incorporate and rely on their arguments with respect to Count I of the Counterclaim. ECF 321 at 4-5; ECF 324 at 26. But, Topline also argues that that "the sole instance of alleged misconduct . . . does not amount to a failure of consideration sufficient to discharge SSI from its obligations under the HTBC Agreement." ECF 321 at 5 (citing *Brees v. Cramer*, 322 Md. 214, 223, 586 A.2d 1284, 1289 (1991)). In its Opposition, SSI points out that the cross-default provision of the HTBCA (ECF 312-7 ¶ 9.3) provides that a default on the

HTBCA constitutes a default on the Franchise Agreement, and that the cross-default provision of the CDA provides that a breach of the Franchise Agreement bars claims under the CDA. ECF 1-1 at 18 ¶ 11. Moreover, SSI argues that the authority cited by Topline is irrelevant here.

In light of my decision as to Count I of the Counterclaim and the cross-default provisions of the HTBCA and the CDA, I shall deny the Motion to Strike as it pertains to SSI's Seventh Affirmative Defense.

As indicated, I determined, *supra*, that SSI satisfied the pleading standard for a claim of breach of ¶ 4.2 of the HTBCA. Moreover, the HTBCA and CDA each have relevant cross-default provisions. Paragraph 9.3 of the HTBCA provides: "A material default by Ram Das or Topline under this Agreement shall be deemed a default under the Ram Das or Topline's License Agreement, as may be respectively applicable." ECF 312-7 at 11 ¶ 9.3. And, ¶ 11 of the CDA provides, in pertinent part, ECF 1-1 at 18, ¶ 11:

> If either [Topline] or [Ram Das] is in default under their respective License Agreements, as amended in writing, until such default is cured, any amounts due under this Agreement shall be accumulated and not credited to the respective [Topline's] or [Ram Das's] account.

Under the cross-default provisions of the various agreements, a violation of the HTBCA results in a default under the CDA. Therefore, viewing the facts in the light most favorable to SSI, SSI's Seventh Affirmative Defense is a viable defense to Topline's Complaint. Accordingly, I shall deny the Motion to Strike.

## VI.   Conclusion

In view of the foregoing, I shall GRANT the Motion to Dismiss (ECF 320) in part and DENY it in part. And, I shall DENY the Motion to Strike. ECF 321.

I shall GRANT the Motion to Dismiss, with prejudice, as to Count I of the Counterclaim with respect to SSI's claim for breach of ¶ 4.1.2 of the HTBCA. I shall also GRANT the Motion

to Dismiss, with prejudice, as to Count IV of the Counterclaim. And, I shall GRANT the Motion to Dismiss, without prejudice, as to Count II of the Counterclaim.

As to Topline, Inc., I shall DENY the Motion to Dismiss with respect to SSI's claim for breach of ¶ 4.2 of the HTBCA in Count I. Furthermore, as to Topline, Inc., I shall DENY the Motion to Dismiss Count III of the Counterclaim.

Finally, I shall GRANT the Motion to Dismiss the Counterclaim, without prejudice, as to all claims against Steven Kraner.

Within 7 days of the date of docketing of this Memorandum Opinion and Order, SSI may file an Amended Counterclaim.

An Order follows, consistent with this Memorandum Opinion.


Date: May 8, 2017 _____/s/_____
Ellen Lipton Hollander
United States District Judge